THE DEPARTMENT OF FINANCIAL INSTITUTIONS, ET AL.
v. HOLT, DOING BUSINESS AS HOLT NASH CO., ET AL.

[No. 28,867. Filed November 13, 1952.]

294

*J. Emmett McManamon,* Attorney General, *Clyde H. Jones,* and *Thomas L. Webber,* Deputy Attorneys General, for appellant.

*Leo M. Gardner* and *Alan W. Boyd,* of *Barnes, Hickam, Pantzer & Boyd,* of Indianapolis, for appellees.

*John K. Ruckleshaus* and *John C. O'Connor* of *Ruckelshaus, Reilly, Rhetts & O'Connor,* of Indianapolis for Indiana Association of Installment Credit Companies, Inc., *Amicus curiae.*

DRAPER, J.—This action was brought by one Holt, a retail seller of automobiles, on behalf of himself and all others similarly situated, to enjoin the enforcement of so much of Section 58-910 Burns' Stat. (Section 10, Indiana Retail Installment Sales Act, hereinafter called the "Act"), as purports to authorize the appellant Department of Financial Institutions to limit by regulation the amount which a purchaser of retail installment sales contracts can pay or agree to pay therefor to a retail dealer selling the same; to enjoin the enforcement of the rule of said Department adopted pursuant to the provisions of said section; and challenging the constitutionality of said section and said rule.

Appellee Moore, an automobile dealer, and a member of the class represented by Holt, and appellee Universal C. I. T. Credit Corporation, a finance company and licensee of the Department, were thereafter permitted to intervene and file complaints seeking the same relief. Holt later dismissed his complaint, and the case was submitted for trial on the complaints of the intervenors and the pleadings responsive thereto. From an adverse judgment the Department appeals.

Appellee Moore and other retail sellers of automobiles frequently enter into written contracts in connection

with such retail sales where the purchase price does not exceed $2,500, is payable in installments over a period of time, and where the sellers take and retain a security interest until full payment of the purchase price. Such contracts are "retail installment sales" within the meaning of the Act. Burns' Stat., §58-901.

Although only a portion of Sec. 10 is under attack here, a passing reference to some of the other sections of the Act might be helpful to a complete understanding of the question presented. Sec. 2 provides that such sales shall be evidenced by an instrument in writing signed by the retail buyer and a copy thereof shall be delivered to him at the time of its execution. Under Sec. 4 the contract is required to specify separately (a) the cash price of the article sold; (b) the amount of the down payment; (c) the unpaid balance of the price; (d) the cost of insurance, if any; (e) the balance owing; (f) the amount of finance charge; and (g) the time balance owed and the number of installment payments required, and the amount and date of each payment. Sec. 6 provides that such finance charge may not exceed the maximum finance charge which the Department is authorized and required to fix under Sec. 26 of the Act. By Sec. 9 of the Act the retail seller is prohibited from selling, assigning, or transferring such a contract to anyone other than a licensee under the Act. Sec. 11 provides for licensing persons who purchase retail installment contracts from retail sellers, and prohibits the purchase thereof by anyone not so licensed. Sec. 15 authorizes the Department to revoke or suspend any license issued by it for any failure to comply with the provisions of the Act or any rule or regulation of the Department; Sec. 16 provides for court review of departmental regulations and decisions; and Sec. 29 makes the violation of any of the provisions

of the Act or regulations adopted pursuant thereto a criminal offense and prescribes penalties.

Because the capital of the average dealer is not unlimited, he usually sells such retail installment sales contracts immediately after their acquisition. Whether such sales are made with or without recourse is a matter of contractual arrangement between the retail seller and the licensee. There are about two thousand automobile dealers in the state of Indiana, and the annual volume of sales of such contracts in Indiana approximates $100,000,000.

C. I. T. is a licensee under the Act and purchases such contracts in the amount of approximately $25,000,000 a year from about four hundred retail sellers in the state, and has standing agreements for such purchases with about one-half of that number, including appellee Moore. There are between forty and fifty finance companies, the major part of whose business is the purchase of such contracts in Indiana. Some operate on a national basis, some on a state-wide basis, and others operate locally. Other licensees competing for such contracts are banks, industrial loan companies, small loan companies and credit unions.

Sec. 10 provides in relevant part that:

". . . .

"No licensee shall enter into any agreement with any retail seller regarding the purchase of any retail instalment contract whereby the retail seller shall receive, directly or indirectly, any benefit from or part of any amount collected or received from any retail buyer, as a finance charge or as the cost of the insurance to the retail buyer, in excess of an amount fixed and determined by the department and no licensee shall directly or indirectly pay any part of the amount collected as a finance charge or retail buyer's cost of insurance to any retail seller on any retail instalment contract

purchased from him in excess of the amount so fixed; . . . ."

Pursuant to the provisions of Sec. 10 the appellant Department adopted Rule 28-926-3, which purports to fix the maximum amount of the finance charge which purchasers of retail installment contracts may pay to retail sellers of automobiles. Although the limitations of Sec. 10 are imposed only on licensees, in effect they are also imposed on sellers by the operation of Sec. 9, which prohibits the sale of retail installment contracts to anyone except licensees. Since only the lawful buyers are subject to price restriction, the sellers are likewise restricted if Sec. 10 is valid. It is undisputed that the amount which licensees would be willing to pay for such contracts, and consequently the amount the retail sellers would receive for them, would be higher than the maximum presently permitted under the regulation of the Department in the absence of such restriction.

The trial court found that the portion of Sec. 10 under consideration and the rule adopted pursuant thereto contravenes Art. 1, Sec. 1 of the Constitution of Indiana[1], and enjoined the enforcement, by the Department, of said statute and said rule. Although the attention of this court has heretofore been directed to Sec. 10, the question presented has never been con-

---

[1] "WE DECLARE, That all men are created equal; that they are endowed by their CREATOR with certain unalienable rights; that among these are life, liberty and the pursuit of happiness; that all power is inherent in the People; and that all free governments are, and of right ought to be, founded on their authority, and instituted for their peace, safety, and well-being. For the advancement of these ends, the People have, at all times, an indefeasible right to alter and reform their government." Art. 1, §1.

sidered or decided. We first consider the constitutional question.

Although it has not escaped criticism, the general rule in Indiana is that in determining the constitutionality of a statute involving the exercise of police power the question is one of law, and only those facts of which this court will take judicial notice will be considered, although extrinsic facts may be brought to the attention of the trial court by counsel to assist it in determining the matters of which it will take judicial notice. All of the attorneys interested in this case have taken commendable advantage of their opportunity to do so. In the consideration of this case we are governed by the general rule, and shall consider only the statute involved, the sections of the state constitution with which it is claimed to be in conflict, and facts of which this court will take judicial notice. *Department of Insurance* v. *Schoonover* (1947), 225 Ind. 187, 72 N. E. 2d 747; *Kirtley* v. *State* (1949), 227 Ind. 175, 84 N. E. 2d 712.

We approach a consideration of the constitutionality of the statute with a presumption in favor of its validity. If there is doubt concerning it, that doubt must be resolved in favor of its constitutionality. *Richmond Baking Co.* v. *Dept. of Treasury* (1939), 215 Ind. 110, 18 N. E. 2d 778, and cases cited.

It must be conceded that there were certain abuses in the traffic in these contracts in Indiana prior to the 1935 Act. Some of them are pointed out in *United States* v. *General Motors Corporation* (1941), 121 F. 2d 376. These abuses resulted in excessive and unreasonable costs to the retail installment buyer. The 1935 Act followed as a consequence and provision was therein made, as above stated, for the regulation of the fair maximum finance charge which the retail buyer may

be required to pay, and the amount which the licensee may pay the dealer for these contracts. The appellees do not challenge the validity of the former. They direct their attack at the latter, it being their position that the buying public is fully protected against unfair and exorbitant finance charges by the former and that the latter is an improper exercise of the police power, and constitutes an unwarranted restriction of appellee's liberty and property in violation of Art. I, §1 of our Constitution.

The appellants on the other hand insist that the challenged provision of Sec. 10, and the regulations made pursuant thereto, are in the public interest and constitute a reasonable and valid exercise of governmental control. It takes the position that Sec. 10 can be sustained as a means of protecting the public against fraud, and as a means of restricting monopoly, and that fair maximum finance charges cannot be fixed or maintained unless the amounts paid to dealers can be restricted.

The provisions of Sec. 10 do limit and restrict the liberty and property rights of retail sellers of automobiles as guaranteed by the constitutional provisions above referred to. But it is conceded by the appellees, as it must be, that neither property rights nor contract rights are absolute, and that such may be restricted by legislation constituting a proper exercise of the police powers of the state in protecting the public health, safety, morals and welfare. It is asserted on the one hand, and denied on the other, that the legislation in question is a valid exercise of the police power of the state of Indiana, and the case resolves itself into that question.

In determining whether legislation is violative of constitutional restraints the courts will confine them-

selves to the question, not of legislative policy, but of legislative power. The law must not be arbitrary, unreasonable or patently beyond the necessities of the case. The legislature may not under the guise of protecting public interests arbitrarily interfere with private business or impose unnecessary restriction upon lawful occupations. If the law prohibits that which is harmless in itself, or if it is unreasonable and purely arbitrary, or requires that to be done which does not tend to promote the health, comfort, morality, safety or welfare of society, it is an unauthorized exercise of power. *Weisenberger* v. *State* (1931), 202 Ind. 424, 175 N. E. 238; *Department of Insurance* v. *Schoonover, supra; Kirtley* v. *State, supra; Commonwealth* v. *Zasloff* (1940), 338 Pa. 457, 13 A. 2d 67.

In *Blue* v. *Beach* (1900), 155 Ind. 121, 131, 56 N. E. 89, this court said:

"As a general proposition whatever laws or regulations are necessary to protect the public health and secure public comfort is a legislative question, and appropriate measures, intended and calculated to accomplish these ends, are not subject to judicial review. But, nevertheless, such measures or means must have some relation to the end in view, for, under the mere guise of the police power, personal rights and those pertaining to private property will not be permitted to be arbitrarily invaded by the legislative department; and consequently its determination, under such circumstances, is not final, but is open to review by the courts. If the legislature, in the interests of the public health, enacts a law, and thereby interferes with the personal rights of an individual, destroys or impairs his liberty or property, it then, under such circumstances, becomes the duty of the courts to review such legislation, and determine whether it in realty relates to and is appropriate to secure the object in view; and in such an examination the court will look to the substance of the thing involved, and will not be controlled by mere forms."

The statutory provision authorizes the fixing of a maximum price which a seller can charge, or agree to charge, and a buyer can pay, or agree to pay, for property. The statute itself describes the transactions to which it applies as the purchase of retail installment contracts. If the transaction is bonafide, the amount paid for such a contract represents the purchase price of property, whether a portion of it is called "dealers participation" or something else. *Black v. Contract Purchase Corp.* (1950), 327 Mich. 636, 42 N. W. 2d 768; *General Motors Acceptance Corp. v. Weinrich* (1924), 218 Mo. App. 68, 262 S. W. 425; Anno. 165 A. L. R. 649. We think, therefore, that the validity of this legislation must be determined by the application of the principles upon which the validity of price fixing legislation depends, though bearing in mind that these sales may not be considered as wholly separate events or isolated transactions wholly dissociated from their context or the background against which they are found. *East New York Savings Bank v. Hahn* (1945), 326 U. S. 230, 66 S. Ct. 69, 90 L. Ed. 34, 160 A. L. R. 1279.

Property is more than the physical object which a person owns. It includes the right to acquire, possess, use and dispose of it without control or diminution save by the law of the land. The term includes valid contracts. *Dept. of Financial Inst. v. General Finance Corp.* (1949), 227 Ind. 373, 86 N. E. 2d 444, 10 A. L. R. 2d 436. As a general rule the right of the owner to fix the price at which he will sell is an inherent attribute of the property itself. *Old Dearborn Distributing Co. v. Seagram Distillers Corporation* (1936), 299 U. S. 183, 192, 57 S. Ct. 139, 143, 81 L. Ed. 109, 106 A. L. R. 1476; *Commonwealth v. Zasloff, supra.*

This court has in the past consistently refused to follow the "pattern" or "drift" apparent in the decisions

of other courts which approve mere legislative price fixing. In *Street* v. *Varney Electrical Sup. Co.* (1903), 160 Ind. 338, 66 N. E. 895, a statute fixing a minimum wage rate for unskilled labor on public work was held invalid. In *State Board of Barber Examiners* v. *Cloud* (1942), 220 Ind. 552, 44 N. E. 2d 972, the same fate befell an act authorizing the fixing of minimum barber prices. In *Kirtley* v. *State, supra,* this court held invalid a statute forbidding the resale of admission tickets to places of public amusement or recreation at a price different than the regular price. *Albert* v. *Milk Control Board of Indiana* (1936), 210 Ind. 283, 200 N. E. 688, marked an exception. In that case this court, following *Nebbia* v. *People of State of New York* (1934), 291 U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940, upheld the authority of the Milk Control Board to determine the minimum prices to be paid for milk. It was there observed that the milk supply is affected with a public interest and has a direct relation to public health and the general welfare of the people. The price fixing feature of the legislation was necessary to the accomplishment of the purposes of the act, and therefore was not an unnecessary and unwarranted interference with individual liberty. None of the language necessary to the decision of that case could be interpreted as an approval of mere price fixing, as such.

As said in *Nebbia* v. *People of State of New York, supra,* "there can be no doubt that upon proper occasion and by appropriate measures the state may regulate a business in any of its aspects, including the prices to be charged for the products or commodities it sells." The abuses existing in the field of automobile financing were such that some degree of regulation in the public interest was necessary. But as this court had occasion to

observe in *State Board of Barber Examiners* v. *Cloud*, *supra*, it does not follow from the fact that regulation for some purposes and in some ways is justifiable, that the right exists to regulate for all purposes and in all ways. The legislation under consideration which, as we have said, does invade freedom of contract and property rights, can only be sustained as a valid exercise of the police power if it both relates to the claimed objective and employs means which are both reasonable and reasonably appropriate to secure such objective. *Blue* v. *Beach, supra; Kirtley* v. *State, supra; Department of Insurance* v. *Schoonover, supra.* The public has no legitimate interest in the relative profits of licensees or retail dealers. The interest of the public is concerned with the total finance charge, and not with the prices at which these contracts pass between the retail seller and the licensee, and if the cost of financing to the retail buyer is otherwise adequately regulated and controlled so that the cost of financing to such buyer is not affected, the public could not be injured or the general welfare impaired. *Dept. of Financial Inst.* v. *Johnson Chev. Co.* (1950), 228 Ind. 397, 92 N. E. 2d 714.

In other words, if the interests of the retail buying public are adequately safeguarded against unfair and exorbitant finance charges by other provisions of the Act, the provision under consideration cannot be said to bear a real and substantial relation to the public health, safety, morals or welfare, or to be reasonable or reasonably related to the purpose sought to be accomplished. *Liggett Co.* v. *Baldridge* (1928) 278 U. S. 105, 49 S. Ct. 57, 73 L. Ed. 204.

The prevention of fraud is a legitimate exercise of the police power of the state, as is also the promotion of

competition by prohibiting monopolistic practices. *Dept. of Financial Inst.* v. *General Finance Corp., supra,* and cases therein cited. Some of the sections of the Act are unquestionably aimed at the suppression of fraud. Notable in that regard is Sec. 4, which requires the separate listing of the various items which go to make up the total cost of merchandise and financing to the purchaser, and Sec. 2 which requires that a copy of the contract be delivered to the retail purchaser. Other sections tend in that direction. But we do not believe that portion of Sec. 10 presently under consideration can be said to be aimed at the suppression of fraud. The appellant alludes to a provision in the C. I. T. contract with the retail seller which provides that the retail seller will be under full recourse liability to C. I. T., notwithstanding the language of the assignment of the paper involved, if the retail dealer discloses to the customer any part of the agreement between the retail dealer and C. I. T., and the appellant says "This certainly is tainted with a fraud against the public generally." Why the contract is so tainted, or how fraud could follow or be fostered by the inclusion of that provision in the contract is not pointed out by the appellant, and since we ourselves have not discovered it, we dismiss this contention without further consideration.

It is appellant's further position that if the price of this paper is not regulated and controlled a few of the larger companies with greater resources can, by paying more for it, eventually eliminate the smaller companies and divert all of these contracts to themselves, since the smaller companies will be unable to compete on a price basis; that these higher prices will naturally reflect as an increase in the finance company's cost of doing business; and any increase in such cost will have to be reflected in the total charge,

and consequently, the Department will be compelled to recognize such increased cost and will be unable to hold the line on the overall cost of financing to the general public.

Some of the sections of the Act, notably Sections 21 to 24, obviously have for their purpose the prevention of monopolistic practices. In the first three of these sections manufacturers and licensees affiliated with manufacturers, are prohibited from selling goods to retail sellers under an agreement, or on condition or with the understanding that retail installment contracts arising from the sale of the goods be sold to a designated licensee or class of licensees, if the effect is to create or tend to create a monopoly; and threats by manufacturers, or by licensees affiliated with manufacturers, are declared *prima facie* evidence of the sale of goods by the manufacturer under the prohibited agreement, or on such condition, or understanding. Section 24 prohibits the giving of value to a licensee by a manufacturer, and the receipt thereof by a licensee, if the effect of such giving and receipt is to create a monopoly in the licensee.

But we can find in this provision of Sec. 10 no reference to monopolistic practices. It does authorize the fixing of the price at which licensees may buy and retailers may sell without regard to the size or financial resources of the buyer, the degree of efficiency with which it operates, or its purpose or intent in purchasing. We do not believe it can be assumed that free price competition in the purchase of these contracts will result in eliminating all but a very few companies from the business. Experience in other jurisdictions does not, in our opinion, justify the assumption. Small or medium-sized companies are often operated with equal or greater efficiency than are the large com-

panies, and the latter can no more afford to operate at a loss than can the former. The capital employed by a large company is not necessarily larger in proportion to its volume of business than that of a small company, and we can find no basis, other than pure speculation, for assuming that the latter are under any competitive disadvantage with respect to individual purchases, unless it might be, as suggested by appellant, that some companies might operate at a loss until they reached their objective of a monopoly, or some of the larger companies, some of which operate nationally, would for the purpose of monopolizing the market and destroying competition, operate in this state at a loss until their purpose could be accomplished.

Should that situation develop, however, and present laws on the subject of monopolistic practices be found to be inadequate to cope with it, we have no doubt that the legislature would soon devise a cure. Certainly it seems to us that the impact of legislation designed to prevent monopolistic practices should fall upon those who indulge in those practices. It should not be accomplished by restricting or destroying the natural rights of those whose purposes are not subject to criticism, whose business practices are above reproach, and who could not create a monopoly even if they were inclined to do so. Compare *Commonwealth* v. *Zasloff, supra,* and *Tyson & Bro.* v. *Banton* (1927), 273 U. S. 418, 443, 47 S. Ct. 426, 71 L. Ed. 718, 58 A. L. R. 1236; *Fairmont Creamery* v. *Minnesota* (1927), 274 U. S. 1, 8, 47 S. Ct. 506, 71 L. Ed. 893, 52 A. L. R. 163.

It is true, of course, that many of the smaller licensees are vitally interested in the maintenance of the price ceiling on these contracts. The advent of price competition in the market for these contracts might possibly eliminate some of them, as is the

normal consequence of free competition. A higher price ceiling than the one presently fixed might enable an even greater number of companies to enter and operate in this field at a profit. But the police power ought not to be used for the financial benefit of a small group in the guise of legislation for the public welfare. *State Board of Barber Examiners* v. *Cloud, supra.* It cannot be exercised for the purpose of protecting the profits of licensees at the expense of retail sellers. If the statute is to be sustained, it must be because the financial interests of the public itself are protected by the imposition of the restrictions, and the private gain to the finance companies and the corresponding loss to the retail sellers is a necessary incidental result to which the retail sellers must submit for the common good.

We are not impressed by the argument that the Department would be unable to resist pressures brought upon it by finance companies. We are confident that it can and would do so. However, should it fail to do so, the legislature might feel impelled to fix the maximum fair finance charge by statute as is done in some other jurisdictions.

In fixing a fair maximum finance charge the Department can determine what the fair cost of conducting the business of licensees ought to be, including the amounts paid for these contracts as an item of costs. The Department is not required to recognize whatever amount the licensees wish to pay, or claim they have to pay, for these contracts as a legitimate item of cost. The Department's refusal to do so could not be labelled as arbitrary or capricious. The Department is not required to permit the operation of a racket of any kind to reflect itself in the fixing of maximum rates.

The Department is required to fix charges sufficient to provide adequate credit facilities for retail installment sales. We are not fearful that adequate amounts of capital will be unavailable unless the Department fixes unreasonably high maximum finance charges, nor could the legislature have thought so. The legislative plan indicates the contrary. We conclude that that portion of Sec. 10 under consideration performs no function which affects the public or in which the public has an interest, and that the restrictions thereby imposed upon freedom of contract are neither reasonable nor reasonably related to any end which the State is empowered to accomplish, and consequently that it cannot be sustained as a valid exercise of the police power.

As to the court's jurisdiction to issue the injunction, the rule has been stated to be that courts of equity have jurisdiction to protect property rights by injunction where the petitioner has no adequate remedy at law, even though the injunction for the protection of property rights incidentally involves restraining and enjoining criminal prosecutions or the enforcement of a criminal statute. *State ex rel. Fry* v. *Superior Court of Lake County* (1933), 205 Ind. 355, 186 N. E. 310. It has been stated in other language to be that there is no jurisdiction in equity to restrain criminal prosecutions or the operation of criminal statutes, though injunctive relief will not, for that reason, be denied where the basis of the action is the protection of a property right and the operation of a criminal statute is but incidental thereto. *Dept. of State* v. *Kroger Grocery & Baking Co.* (1943), 221 Ind. 44, 46 N. E. 2d 237.

No criminal prosecution was pending or threatened when this action was commenced, nor had any party to

it done anything contrary to the letter of the law. It seems clear to us that the real basis of this action was the protection of a property right, and that other features of the case were incidental thereto. We think, therefore, the court did have jurisdiction to issue the injunction. The appellant says this case is ruled by *Dept. of State* v. *Kroger Grocery & Baking Co., supra.* which case requires reversal. We cannot agree. The rule above stated was expressly recognized in that case, but the court there held that no property rights were involved.

Judgment affirmed.

EMMERT, J., dissents.

NOTE.—Reported in 108 N. E. 2d 629.