DEPARTMENT OF FINANCIAL INSTITUTIONS ET AL. *v.*
UNIVERSAL C. I. T. CREDIT CORPORATION ET AL.

[No. 29,505. Filed November 22, 1957. Rehearing
denied January 7, 1958.]

*Edwin K. Steers,* Attorney General, *Carl M. Fran-*

ceschini, *George L. Diven,* Deputy Attorneys General, *John K. Ruckelshaus, John C. O'Connor, Ruckelshaus, Reilly, Rhetts & O'Connor, James Wm. Treacy* and *Treacy & Gleason,* all of Indianapolis, for appellants.

*Leo M. Gardner, Alan W. Boyd* and *Barnes, Hickam, Pantzer & Boyd,* of counsel, all of Indianapolis, for appellee Universal C. I. T. Credit Corporation.

*Gustav H. Dongus, Fansler, Fauvre, Dongus & Chambers,* of counsel, all of Indianapolis, for appellee, Automobile Dealers Association of Indiana, Inc.

EMMERT, J.—This is an appeal from a judgment of the circuit court, entered on a special finding of facts and conclusions of law, which set aside and vacated an order of the Department of Financial Institutions of the State of Indiana entered the 28th day of December, 1955. The order of the Department required the Universal C. I. T. Credit Corporation to cease and desist from making payments of any kind or character, directly or indirectly, to any automobile dealer within the State of Indiana for or in connection with the purchase, assignment or acquisition of a retail installment sales contract for the purchase of an automobile or motor vehicle in excess of the following designated amounts:

> "10% of the gross finance charge which includes only such consideration which the retail buyer contracts to pay the retail seller for the privilege of paying the principal balance in installments over a period of time."

The order of the Department of Financial Institutions was entered on a special finding of facts and conclusions of law made by it after a hearing on a complaint filed by Consolidated Finance Corporation and others,

licensees of the Department to purchase retail install-
ment contracts for the sale of motor vehicles. The
complaint before the Department was brought under
ch. 207 of the 1953 Acts, Sections 58-935 to 58-945,
Burns' 1951 Repl. Supp., and charged the Universal
C. I. T. Credit Corporation "is engaging in practices
which would tend to lessen competition or tend to
create a monopoly in such business field," in that Uni-
versal was offering directly or indirectly certain ex-
cessive and discriminatory payments, benefits and
inducements to automobile dealers of various types and
kinds for retail installment sales contracts for the pur-
chase of automobiles for the purpose of eliminating
smaller Indiana competitors."

On March 11, 1955, the Automobile Dealers Asso-
ciation of Indiana, Inc. filed an intervening petition
with the Department praying that the complaint be
dismissed. It also intervened in the circuit court.

The issue here is whether the Department could
legally and constitutionally prohibit the Universal C. I.
T. Credit Corporation from paying more than 10% of
the gross finance charge on automobile installment con-
tracts which it purchases and proposes to purchase from
automobile dealers within the State.

Section 3 of ch. 207 of the 1953 Acts prohibited
monopolies in the following language:

"It is declared illegal for any licensee under the
provisions of the Retail Installment Sales Act to
enter into any contract, agreement or arrangement
with any person, firm or corporation, or to engage
in any practice which would tend to lessen competi-
tion or tend to create a monopoly in such business
field." Section 58-937, Burns' 1951 Repl. Supp.

Section 1 of the Act declared the objects and purposes of the Act, and attempted to define what was a monopoly or a tendency toward monopoly by providing:

" . . . that in the business of purchasing retail installment sales contracts for specific goods, certain practices have developed or may develop which may tend to lessen competition and may tend to create a monopoly in such business field; that it is in the public interest that there should be free competition in such business field, and any acts or practices which would, or would tend to, reduce the number of persons competing for the purchase of such contracts, or would, or would have the tendency to, make it difficult for the smaller purchaser to compete, or would, or would tend to, concentrate such business in one or more of the larger and more economically powerful purchasers, is a tendency toward monopoly and not in the ultimate public interest in that a few such dominant purchasers may then use their economic power and their position to control the entire business field; that reasonable competition should be encouraged in such business field; that the encouragement of such competition requires the preservation of a large number of buyers freely competing for such purchases; that existing legislation is inadequate to preserve such competition and power is not vested in any public body to deal expeditiously with such practices, and it is in the public interest that powers be vested and procedures provided for preventing any such agreements or practices which would have the effects herein described; and this act is designed to achieve these objectives." Section 58-935, Burns' 1951 Repl. Supp.

Four members of the Department made the special finding of facts by it and signed the order to cease and desist, but two members of the Department dissented from the majority action.

It is well settled that when a court reviews the action of an administrative body in a case not involving

a taking of property without due process of law, the courts will not upset the action of the administrative agency if it was acting within the scope of its jurisdiction, and there was substantial evidence of probative value to sustain its findings or action. *N. Y., C. & St. L. R. R. Co.* v. *Singleton* (1934), 207 Ind. 449, 458, 190 N. E. 761; *Warren* v. *Indiana Telephone Co.* (1940), 217 Ind. 93, 118, 26 N. E. 2d 399; *Nash* v. *Meguschar* (1950), 228 Ind. 216, 222, 91 N. E. 2d 361. We have examined the evidence given before the Department, which was the only evidence before the trial court on review, and we are of the opinion that the special finding of facts and conclusions of law made by the circuit court did not violate this rule.

The evidence before the Department disclosed that there were approximately 1,400 automobile dealers doing business within the State of Indiana, 900 of them being members of the intervenor Automobile Dealers Association of Indiana, Inc. The Retail Installment Sales Act does not require the retail sellers to be licensed. Mr. Loren H. Brewer, the supervisor of the Consumers Credit Division of the Department of Financial Institutions, testified that during the time in question there were 236 state banks and 54 national banks doing business within Indiana, but appellant's brief does not show how many of these banks, if any, had licenses to buy retail installment credit contracts, or how many of them were doing so. He further testified that in 1953 there were 205 licenses issued under the Retail Installment Sales Act, about 90% of which were also authorized to engage in the small loan business. For the year ending July 1, 1953, the total value of the retail installment sales in Indiana for all goods, wares and merchandise was $272,000,000, but this total

is not broken down by classification in appellant's original brief, but presumably by far the largest amount was for automobiles.[1] In Indiana, Universal had 10 or 12 branch offices, but it was not a major competitor within Indiana as disclosed by the following evidence:

For the years 1952 and 1953 the comparative amount of business handled by Universal and three other major finance companies was as follows:

|                                          | 1952    | 1953    |
| ---------------------------------------- | ------- | ------- |
| Universal C. I. T. Credit Corporation    | 6.78%   | 5.85%   |
| Associates Investment Company            | 22.8%   | 22.8%   |
| General Motors Acceptance Corporation    | 21.49%  | 25.79%  |
| Commercial Credit Corporation            | 10.00%  | 11.66%  |

Universal C. I. T. Credit Corporation was owned by Commercial Investment Trust, Inc., which in turn was owned by C. I. T. Financial Corporation, but the evidence fails to disclose any details on the question of control or practice either in Indiana or over the nation. Service Fire Insurance Company of New York was owned by Commercial Investment Trust, Inc. and this insurance company was utilized by Universal to write its liability, fire and theft automobile insurance policies, but some of such insurance business was placed with National Casualty Insurance Company of Detroit, Michigan, the amount not shown by the record. Universal also had an arrangement with Connecticut General Insurance Company to write credit life insurance policies when that was purchased by the buyer.

---

1. On the national level, by the end of 1956 there were $31.6 billions of credit extended on installment paper, $14.4 billions of which were for automobiles. Automotive paper constituted 88.8% of all installment credit extended by finance companies. In 1956, 70% of new automobiles and 85% of used cars were sold on credit. Magazine of Wall Street, Oct. 12, 1957, page 83.

In 1952, this court, with one dissent, decided *Department of Financial Institutions* v. *Holt*, 231 Ind. 293, 108 N. E. 2d 629. This case held that Section 10 of the Retail Installment Sales Act, Sec. 58-910, Burns' 1951 Replacement, and the rules of the Department which fixed the maximum amount of finance charge which could be paid as dealer participation to retail sellers of automobiles, was unconstitutional and void. In so holding the court said, "The public has no legitimate interest in the relative profits of licensees or retail dealers. The interest of the public is concerned with the total finance charge, and not with the prices at which these contracts pass between the retail seller and the licensee, and if the cost of financing to the retail buyer is otherwise adequately regulated and controlled so that the cost of financing to such buyer is not affected, the public could not be injured or the general welfare impaired. *Dept. of Financial Inst.* v. *Johnson Chev. Co.* (1950), 228 Ind. 397, 92 N. E. 2d 714." (Page 305.) After this decision a substantial number of automobile dealers were demanding finance companies pay a larger amount as dealer participation.[2]

Prior to November 8, 1954, Universal paid no amounts as dealer participation in excess of the limits fixed by the Department in the General Order which had been held invalid in the Holt case, *supra*. After November 8, 1954, Universal offered various dealers amounts of dealer participation in excess of this ceiling.

---

2. For a history of dealer participation, see Philip D. Pecar, Is Control of Dealer Participation a Necessary Adjunct To Regulation of Installment Sales Financing? 28 Ind. Law Jl. 641 (1953), and Dealer Participation in Automobile Finance Charges: A Reply, 30 Ind. Law Jl. 319 (1955); also Russell Hardy, Another View On The Origin of Dealer Participation In Automobile Finance Charges, 30 Ind. Law Jl. 311 (1955).

Some payments amounted to 20% of the gross finance charge plus 20% of the insurance premiums.

On November 28, 1954, Consolidated Finance Company and 22 other finance companies filed a complaint before the Department. By agreement the hearing was held before one member of the Department, and evidnce was heard on April 11th, 12th, 13th and 14th, 1955. The Department's findings and conclusions were filed December 28, 1955, and the order to cease and desist was entered the same day. Thereafter the appeal to the Marion Circuit Court was had, where the order of the Department was vacated and enjoined.

The appellants contend we should reconsider the opinion of this court in *Department of Financial Institutions* v. *Holt,* 231 Ind. 293, 108 N. E. 2d 629, *supra.* It must be remembered that the Holt case only had in issue Sec. 10 of the Retail Installment Sales Act, Sec. 58-910, Burns' 1951 Replacement, and the rule of the Department adopted pursuant thereto, while in the appeal at bar. Universal was called upon to meet the issues set forth by the complaint filed with the Department under the 1953 Monopoly Act, Sec. 58-935, *et seq.,* Burns' 1951 Replacement (Supp.). That complaint charged, "Universal C. I. T. Credit Corporation has and is proceeding to offer directly or indirectly certain excessive and discriminatory payments, benefits and inducements to automobile dealers of various types and kinds for retail installment sales contracts for the purchase of automobiles for the purpose of eliminating smaller Indiana competitors; that such conduct referred to herein on the part of said licensee has a tendency to create a monopoly in such business field." The complaint made no attempt to assert that Sec. 10, and the rule of the Department based thereon, were a valid

exercise of the police power of the State, nor did it present any other issue except that of monopoly as charged under Sec. 3 of ch. 207 of the 1953 Acts. This was the sole issue tendered, and we fail to see how the general police power of the State is involved except as to the prevention and prohibition of monopolies under this Act.

It would not be possible to state any general definition of monopoly from the many decided cases on the subject, and then use the definition as a major premise in deciding the appeal at bar. The cases generally construe some statute, such as the Sherman Anti Trust Act, and involve the particular facts of each case, so that each case must be interpreted in the light of the law and the facts there involved.

Section 1 of the 1953 Act, if literally construed as the appellants insist, seems strangely inconsistent. It recommends free competition in the particular business field, but not such as would make it difficult for smaller purchasers to compete. Everyone is urged to compete, but if a larger and more economically powerful purchaser does compete and in the process hurt a smaller competitor, such competition is condemned as a tendency toward monopoly. Competition is always a contest for trade. Quite often what is one man's gain may be a loss to his competitor. There may not be enough business in the field for all competitors to get all they would like, or to operate at a profit.[3] The less efficient may not be able to stand the pace and drop out of the race. The man who makes

3. "It must be remembered that all trade is and must be in a sense selfish; trade not being infinite, nay, the trade of a particular place or district being possibly very limited, what one man gains another loses." *Mogul Steamship Co.* v. *McGregor, Gow, & Co.* (1888), 21 Queen's Bench Division 544, 553.

a better mouse trap may get all the mouse trap business, and his competitors compelled to go into other businesses, but the law has never condemned that. The State, acting through its legislature or its courts, may make reasonable rules of fair competition, but we have not been cited to any case in the field of monopolies, nor do we know of a decision that holds that simply because A is more successful in his competition he is thereby guilty of violating the rules against monopolies because some weaker or less efficient competitor makes less profit, or none at all. The State cannot have it both ways in the field of monopolies; it cannot urge all to compete, and then penalize those who do successfully compete under fair rules of competition.

Again, Section 1 of the 1953 Monopoly Act states "that reasonable competition should be encouraged in such business field; that the encouragement of such competition requires a preservation of a large number of buyers freely competing for such purchase (of installment sales contracts) . . . ." But "reasonable competition" may not result in the preservation of a large number of buyers. As was said in *Package Closure Corporation* v. *Sealright Co.* (2d Cir. 1944), 141 F. 2d 972, 977, "Of course, if, without concert, the defendants had severally sold at a price injurious to plaintiff, their conduct would not have been actionable, for, ordinarily, one engaged in actual competition, may sell his products at such prices as he chooses regardless of the consequences to his competitors. Indeed, keen rivalry *in* [is] the essence of that competition which the common law fosters and which the Sherman Act is designed to promote. Because of the assumed value of competition—to consumers and also as a stimulant of enterprising characteristics, regarded as desirable, in the competitors themselves—the com-

mon law recognizes a privilege (which the Sherman Act underscores) to do acts, when engaged in competition, resulting in financial loss to others, although, in the absence of a competitive purpose, those same acts would give rise to legal liability. As Mr. Justice Holmes said, 'A man has a right to set up a shop in a small village which can support but one of the kind, although he expects and intends to ruin a deserving widow who is established there already,' this privilege resting 'on the economic postulate that free competition is worth more to society than it costs.' "

The many federal cases deciding questions of unlawful monopolies have held many times what is reasonable or unreasonable competition under the various acts prohibiting monopolies. If Section 1 of the 1953 Monopoly Act is construed by limiting it to the prevention of unreasonable competition, no insurmountable difficulty or constitutional prohibitions are involved, and appellees' answer brief concedes this. We hold the Act should be so construed.[4]

The Retail Installment Sales Act defines the finance charge to mean "any consideration which the retail buyer contracts to pay the retail seller for the privilege of paying the principal balance in instalments over a period of time." Sec. 58-901, Burns' 1951 Repl. (Supp.). Section 58-926 (b), Burns' 1951 Replacement, makes it the duty of the Department, "To determine and fix by a general order the fair maximum finance charges that may be contracted for in retail instalment con-

---

4. "The words 'fair competition' by a long series of judicial decisions have been fully defined. These definitions do not include price fixing. Competition has three elements: (1) Price; (2) quality; and (3) service. Price regulation is the antithesis of competition, fair or otherwise." *Mississippi Valley Hardwood Co.* v. *McClanahan* (1934), 8 Fed. Supp. 388.

tracts or that may be contracted for in retail instalment contracts of any classes which may be established by the department, . . . " No attack was made on the duty of the Department to fix the finance charge either in the Holt case, *supra,* or in the appeal at bar, and this duty to fix the maximum finance charge is to be borne in mind while considering the 1953 Act on monopoly in the field of purchasing installment sales contracts.

Quite naturally the automobile dealers are interested in obtaining as large an amount from the sale of their installment contracts as the finance companies will pay. In *Department of Financial Institutions* v. *Holt* (1952), 231 Ind. 293, 108 N. E. 2d 629, *supra,* we held that the purchasers of automobiles from the dealers were adequately protected by the fixing of the amount of the finance charge by the Department, and once that was done they had no legitimate interest in how much was paid as dealer participation. The plaintiff-licensees filed the complaint before the Department and thereby undertook to sustain their burden of proof that Universal had violated Section 3 of the 1953 Monopoly Act as charged in their complaint. If they did not sustain that burden of proof the finding and order by the Department is not sustained by sufficient evidence and was contrary to law. The Marion Circuit Court by its special findings and conclusions so held.

There was testimony at the hearing before the Department as to the financial condition of five plaintiff-licensees and as to what would have been their profits had they been compelled to pay the amount of dealer participation offered by Universal, Associates, GMAC and Commercial Credit Corporation. From an examination of this evidence all we are able to determine is their profits would not have been as much. One of these

was losing money under the previous rates of dealer participation pay. There was no evidence offered as to the efficient operation of any of these companies, or the nature of the competitive field in which they sought to participate.

There was no evidence that Universal had formed an agreement, an understanding, a working arrangement, or a conspiracy with any other finance company to increase the amount of dealer participation. The facts are wholly dissimilar to those in *American Tobacco Co.* v. *U. S.* (1946), 328 U. S. 781, 66 S. Ct. 1125, 90 L. Ed. 1575, where the evidence was sufficient to prove a conspiracy to rig the markets for tobacco, to prevent the establishment of any new markets, and to use of their financial power to bid up the price of low grade tobacco thus putting the cheap cigarette makers out of business by depriving them of their sources of supply. Nor was there any evidence that Universal attempted or had the power to obtain control of credit which could be used to prevent other finance companies from obtaining capital to engage in the business of purchasing installment sales contracts. See *U. S.* v. *Aluminum Co. of America* (1945), 148 F. 2d 416.

It cannot be said that Universal acted with any malice in attempting to obtain a larger amount of this business for itself. At the time of the hearing it was only buying installment paper from 150 dealers of the 1,400 dealers throughout the State. Of course it could be charged with the intent of accomplishing the natural consequences of its competition, but more than merely an intent to obtain business for itself would be required to find that it maliciously attempted to put its competitors out of

business. See *U. S.* v. *Aluminum Co. of America* (1945), 148 F. 2d 416, 431, 432, *supra.* The new rates and various plans offered by Universal after November 8, 1954, were not higher than the general dealer participation offered and paid in other states throughout the nation. After Universal began making offers more than it was permitted by the order held invalid in the Holt case, *supra,* other finance companies raised their offers of dealer participation, in some cases in excess of the amount offered by Universal. Universal attempted to meet the competition as it then existed with each particular dealer. There is no evidence that Universal could obtain a larger percent of the business in Indiana than it had obtained in the past, which was less than 7% of the total. It would be purely speculative to assume that it ever could obtain substantial control of the market in Indiana. Universal was wholly divorced from the Ford Motor Company, and it exercised no control whatever over any automobile dealer. In fact many automobile dealers selling to Universal were also selling their paper to other finance companies. Nor is there any evidence that Universal was causing any bank in Indiana to lose money on the amount of dealer participation paid by it, or as to how many banks were engaged in the business of purchasing installment contracts. Nor was there any evidence that Universal was buying any paper at a financial loss to itself.

All that was disclosed by the record here was a free play of competition in the various areas of the State testified about with only a small part of the business going to Universal. Universal had not obtained a monopoly or entered into any agreement or arrangement which would tend to create a monopoly in it,

which was the charge made. There was a failure of proof at the hearing before the Department, and the judgment of the trial court vacating the order was proper. This makes it unnecessary to decide appellees' contention the Act is unconstitutional in various respects. Nor is it necessary to discuss *Teegardin* v. *Foley* (1957), 166 Oh. St. 449, 143 N. E. 2d 824, since the Supreme Court of Ohio did not base its decision on monopoly. The judgment of the trial court should be affirmed.

Judgment affirmed.

Arterburn, C. J., and Bobbitt, Landis, Achor, JJ., concur.

NOTE.—Reported in 146 N. E. 2d 93.