**Tim & Judy CLEM, et al.; James M. Richards, et al., Appellants (Plaintiffs Below),**

v.

**CHRISTOLE, INC.; Hopewell Center, Inc., Appellees (Defendants Below).**

No. 53A04–8712–CV–393.

Court of Appeals of Indiana, Fourth District.

Jan. 17, 1990.

Len E. Bunger, Philip C. Hill, Bloomington, for appellants Tim & Judy Clem, et al.

Michael R. Withers, Anderson, for James M. Richards, et al.

Thomas N. Olvey, Schnorr, Good & Olvey, Indianapolis, Gary J. Clendening, Harrell, Clendening & Coyne, Bloomington, for appellees Christole, Inc.

Ernest M. Beal, Jr., Fort Wayne, for amicus curiae.

Scott Webb, Anderson, for Hopewell Center, Inc.

CONOVER, Judge.

This is a consolidated appeal.[1] Plaintiffs–Appellants, property owners in Fairwood Terrace subdivision in Monroe County, Indiana, and Mustin Manor subdivision in Madison County, Indiana, (Residents), appeal their trial courts' grant of summary judgments in favor of Defendants–Appellees Christole, Inc. (Christole) and Hopewell Center, Inc. (Hopewell) (collectively, developers). Those judgments permit developers to operate group homes for developmentally disabled persons in the residents' single family residential subdivisions.

We reverse.

The residents present several issues for our review which we restate as one, namely, whether the 1988 amendment of a statute authorizing the location of group homes for developmentally disabled and mentally ill persons in single family residential subdivisions constitutes a valid ret-

---

1. *Clem v. Christole, Inc.,* No. 53A04–8712–CV–393 in this Court, an appeal from Monroe Superior court No. III, and *Richards v. Hopewell Center, Inc.,* No. 48A02–8906–CV–268 here, an appeal from Madison Superior Court No. II, involve common questions of law and fact. Thus, they were ordered consolidated for consideration on appeal, cf. Ind. Rules of Procedure, Appellate Rule 5(B).

roactive exercise of the state's police power.

Before 1988, developer Christole purchased a single family residence in Fairwood Terrace subdivision for use as a group home for the care of five unrelated developmentally disabled autistic children to be supervised by thirteen full and part-time staff members. All these developmentally disabled persons' immediate families live elsewhere.

In 1988, Hopewell purchased a single family residence in Mustin Manor subdivision in which it proposed to care for unrelated developmentally disabled persons who also would be supervised by full and part-time staff members. The residents filed a petition for injunctive relief alleging these group homes violated restrictive covenants applicable to the lots in their subdivisions.

The residents of Fairwood Terrace assert Christole's group home violates the following restrictive covenants applicable to their subdivision:

USE: No building, or any part thereof, erected or maintained in this subdivision shall be used for business or commercial purposes of any kind ...

BUILDINGS: Only one (1) single family dwelling may be erected or maintained on each lot in this addition ...

The residents of Mustin Manor maintain Hopewell's group house violates two of their subdivision's restrictive covenants, as follows:

1. LAND USE AND BUILDING TYPE. No lot shall be used except for residential purposes. No building shall be erected, altered, placed or permitted to remain on any lot, other than one detached single family dwelling not to exceed two (2) stories in height and a private attached garage for not more than two (2) cars. No building unattached to dwelling shall be permitted. No lot shall be replatted or subdivided.

. . . . .

5. NUISANCES. No offensive or noxious activity shall be carried on upon any lot nor shall anything be done thereon which may be or may become an annoyance or nuisance to the neighborhood. . . .

The trial court enjoined Christole from violating the applicable covenants. An injunction was not issued against Hopewell because an agreement was reached between Hopewell and the residents providing the subject building would not be modified to accommodate developmentally disabled residents until the lawsuit was heard on its merits.

Thereafter, at its 1988 session, the Indiana legislature amended I.C. 16–13–21–14 and created a new section, 16–13–21–14.-1. The legislature's 1988 amendment to Sec. 14 reads:

Sec. 14. (a) This section applies to each restriction, reservation, condition, exception, or covenant that is created before April 1, 1988, in any subdivision plat, deed, or other instrument of, or pertaining to, the transfer, sale, lease, or use of property.

(b) A restriction, reservation, condition, exception, or covenant in a subdivision plat, deed, or other instrument of, or pertaining to, the transfer, sale, lease, or use of property that would permit the residential use of property but prohibit the use of that property as a residential facility for developmentally disabled or mentally ill persons:

(2) on the ground that the persons residing in the residential facility are not related; or

(3) for any other reason;

is, to the extent of the prohibition, void as against the public policy of the state.

Although Christole had already filed an appeal, we ordered the case remanded to the trial court for further consideration in light of these amendments as a matter of judicial economy. After considering the 1988 amendment to I.C. 16–13–21–14, the trial court vacated its former judgment and entered summary judgment for Christole.

In the Mustin Manor case, Hopewell filed a motion and the residents a cross-motion for summary judgment. The trial court granted Hopewell's motion and denied the residents' cross-motion. It found under

amended Sec. 14, the covenants were void as against public policy. In Christole, the trial court opined the 1988 amendment of I.C. 16-13-21-14 and new section 16-13-21-14.1[2] were directed at the holding in *Adult Group Properties, Ltd. v. Imler* (1987), Ind.App., 505 N.E.2d 459, and it no longer stated the law. The trial court entered summary judgment for Christole.

The residents appeal.

### I. *The Police Power.*

The state has the inherent power to enact laws, within constitutional limits, which promote order, safety, health, morals and the general welfare of society. *Zahm v. Peare* (1985), Ind.App., 502 N.E.2d 490, 494. This power is known as the state's police power. Legislation will be sustained as within the authority of the legislature if it is a proper exercise thereof. *Johnson v. St. Vincent Hospital, Inc.* (1980), 273 Ind. 374, 404 N.E.2d 585, 599; *Steup v. Indiana Housing Finance Authority* (1980), 273 Ind. 72, 402 N.E.2d 1215, 1217, 1220-1221. It has been said

> The police power of a State is recognized by the courts to be one of wide sweep. It is exercised by the state in order to promote the health, safety, comfort, morals, and welfare of the public. The right to exercise this power is said to be inherent in the people of every free government. It is not a grant, derived from or under any written constitution. It is not, however, without limitation, and *it cannot be invoked so as to invade the fundamental rights of a citizen.* (Emphasis supplied).

*State v. Gerhardt* (1896), 145 Ind. 439, 44 N.E. 469, 473. See also *Blue v. Beach* (1900), 155 Ind. 121, 56 N.E. 89, 92. Although it is the legislature's prerogative to determine when the state's police power should be invoked, it is the judiciary's duty to determine in specific cases whether the police power has been invoked upon a subject which is subordinate to it. *Blue*, 56 N.E. at 92; *Gerhardt*, 44 N.E. at 473. The fundamental issue in such cases is whether the statute in question has a tendency to promote either the order, safety, health, morals or general welfare of society. *Bruck v. State ex rel. Money* (1950), 228 Ind. 189, 91 N.E.2d 349.

A statute is accorded every reasonable presumption supporting is validity and constitutionality. *Miller v. State* (1987), Ind., 517 N.E.2d 64, 71; *Imler, supra,* at 464. The burden is upon the challenger to rebut this presumption. *Miller, supra.* The challenger's burden is to clearly and convincingly demonstrate the unconstitutionality of the statute. A court cannot question the wisdom or desirability of the legislation and substitute its judgment or opinion on the matter for that of the legislature. *Dague v. Piper Aircraft Corp.* (1981), 275 Ind. 520, 418 N.E.2d 207, 212. When a statute may be construed so as to support its constitutionality, we must adopt such a construction. *Imler, supra,* at 464.

### II. *Property Owners' Rights.*

While property rights are not absolute and may be restricted by government action which constitutes a proper exercise of police power, *Dept. of Financial Institutions v. Holt* (1952), 231 Ind. 293, 108 N.E.2d 629, 633; *Zahm*, 502 N.E.2d at 494, property cannot arbitrarily be taken or confiscated under the guise of the police power. *Holt, supra,* 108 N.E.2d at 634; *School Town of Andrews v. Heiney* (1912), 178 Ind. 1, 7, 98 N.E. 628, 630. Property is more than the physical object a person owns. It includes the right to acquire, possess, use and dispose of it without control or diminution. *Holt, supra,* 108 N.E.2d at 634. Therefore, any law restricting such rights must not be arbitrary, unreasonable, or beyond the necessities of the case. *Holt, supra,* 108 N.E.2d at 634; *City of Muncie v. Pizza Hut of Muncie, Inc.* (1976), 171 Ind.App. 397, 357 N.E.2d 735, 737. The legislature may not, under the guise of protecting public interests, impose unnecessary restrictions upon lawful

---

**2.** New section 14.1 voids as against public policy all such covenantial restrictions "created after April 1, 1988[.]" Because this appeal concerns covenants lawfully operative prior to April 1, 1988, we express no opinion as to the effectiveness of new section 14.1, a factual posture not present in these cases.

occupations or arbitrarily interfere with private rights. *Holt, supra,* 108 N.E.2d at 634. If the law prohibits something harmless, is unreasonable and purely arbitrary, or does not promote the health, safety, morality, comfort or welfare of society in general, it is an unauthorized exercise of police power. *Id.* Government action constitutes a proper exercise of police power when the collective benefit to the general public outweighs the restraint imposed. *Zahm, supra,* 502 N.E.2d at 494.

Christole contends I.C. 16–13–22–1 et seq., of which amended Sec. 14 is a part, reflects the legislature's determination that integrating, or "mainstreaming", the developmentally disabled into normal residential surroundings is an important purpose which provides qualified residents of group homes a measure of independent living in traditional homes as opposed to institutionalization and continued dependency. Hopewell argues whatever "impairment" of the subdivision residents' constitutional rights is involved here, the same is absolutely necessary to achieve this important state purpose. Enforcement of such covenants would effectively prevent the establishment of group homes in virtually any private housing subdivision in this state and render meaningless rights otherwise granted our disabled citizens, it concludes.

Conversely, the residents claim amended Sec. 14 violates their constitutionally-protected right against deprivation of property without due process of law, and impairs the contract rights vested in them by their subdivisions' covenants which proscribe multi-family housing and commercial operations in their subdivisions. Further, the residents in Mustin Manor subdivision argue the Sec. 14 amendment constitutes an invalid legislative attempt to grant the group house promoters a special privilege not available to the public generally, in violation of their constitutional right against class legislation.

Because we reverse, we need discuss only one issue.

### III. *Deprivation of Property Rights in Covenants.*

The residents' property rights are derived from both the United States and Indiana Constitutions. The Fifth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, provides, in pertinent part:

> ... nor shall any person ... be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

The due process clause of the Fourteenth Amendment further states:

> ... nor shall any State deprive any person of life, liberty, or property, without due process of law; ...

Of equal import, the Indiana Constitution provides, in Article I, § 21:

> ... No man's property shall be taken by law, without just compensation; nor, except in case of the State, without such compensation first assessed and tendered.

In *Pulos v. James* (1973), 261 Ind. 279, 302 N.E.2d 768, our supreme court interpreted these constitutional provisions to prohibit the taking of private property, i.e., private rights granted by subdivision covenants, for private use. Citing several Massachusetts cases with approval, it said

> ... [Restrictive covenants] are real estate. They are part and parcel of the land to which they are attached and with which they pass by conveyance....
>
> ... [I]t is beyond the legislative power to take against his will, the property of one and give it to another for what the court deems private uses, even though full compensation for the taking is required.... If the statute is merely for the benefit of individual property owners, the purpose does not justify the taking of a right in land against the will of the owner.

*Pulos,* 302 N.E.2d at 773–774. Thus, a property owner "is secure under the Constitution in his right to keep what is his own, even though another wants it for private uses ..." *Id. Pulos* also said even if such legislation was premised on benefitting the public good, it was still unconstitu-

tional because no attempt was made to compensate the owners:

> ... It was for [the property owners'] benefit that the restrictive covenants were imposed. Their right to have them enforced is a property right and may not be taken from them without just compensation. Thus, even if it were maintained that the vacation of the restrictions was for the public good, we would run afoul of sections 21 and 23 of Article I of our state constitution and the due process clause of the Fourteenth Amendment to the Constitution of the United States.

*Id.*, 302 N.E.2d at 774.[3]

In a final comment, the *Pulos* court discussed the prohibition of contracts which are against public policy. The court conceded the legislature may prohibit such contracts. However, it concluded the legislature may not impair previously legal contracts where the rights therein granted have already vested. *Id.* at 775. See also *Supreme Council Catholic Knights of America v. Logsdon, et al.* (1915), 183 Ind. 183, 108 N.E. 587, 592; *Imler, supra.*

In such cases, our authority on review is clear:

> ... courts may look to the character and reasonableness of the limitation for the purpose of determining whether or not it reaches beyond the scope of necessary protection and prevention.

*Pizza Hut of Muncie, Inc.*, 357 N.E.2d at 737. See also *Department of Insurance v. Schoonover* (1947), 225 Ind. 187, 72 N.E.2d 747; *Weisenberger v. State* (1931), 202 Ind. 424, 175 N.E. 238.

Recently, our Indiana Supreme Court laid down a two-pronged test to be used in determining whether a statute or regulation constitutes a taking under the U.S. Constitution's Fifth Amendment: whether or not the regulation (a) substantially advances a legitimate state interest, and (b) deprives the owner of the economically viable use of his property. Justice DeBruler, speaking for the court, said

> The essence of the first prong of the test is whether government had the right to exercise its police power in the manner it did, regardless of the burden to property owners. Or, in other words, it asks the question: has government regulated where it should not have done so? If the regulation does not bear a substantial relation to the legitimate ends sought to be achieved, either through a failure of the statute as a whole to serve those ends or as applied to a particular piece of property, then the exercise of the police power is deemed to be unreasonable.
>
> ... [T]he essence of the second prong of the test is whether government has regulated to a greater extent than it should have so that a land owner has been effectively deprived of productive use of his property.

*Dept. of Natural Resources v. Indiana Coal Council, Inc.* (1989), Ind., 542 N.E.2d 1000, 1002–1003, citing *Nollan v. Calif. Coastal Comm'n.* (1987), 483 U.S. 825, 834, 107 S.Ct. 3141, 3146, 97 L.Ed.2d 677, 687.

■ A proper exercise of the state's police power must benefit the general public, not merely a small group of its citizens. The police power should not be used for the benefit of a small group in the guise of benefitting the public. *Pizza Hut of Muncie, Inc., supra,* 357 N.E.2d at 737, and *Holt, supra,* 108 N.E.2d at 637.

■ After careful consideration of the above precedent, we have determined amended Sec. 14 is not a valid exercise of the state's police power because it (a) violates the residents' Fifth and Fourteenth Amendment rights under the U.S. Constitution, and their rights under Article I, § 21 of the Indiana Constitution, and (b) fails the first prong of the *Indiana Coal* test.

---

**3.** *Pulos* does not specifically refer to the term "police power." However, it relies on the concepts involving the proper and improper exercise of police power. The determination of whether the legislature acted outside the constitutional proscriptions which limit the exercise of that power is inherent in its discussion of the issues there presented. Thus, we rely on it in our resolution of these cases, believing *Pulos* sets forth the standards which must be met before an attempted exercise of police power as it relates to the taking of private property is valid.

## IV. *Fifth Amendment Violation.*

In *Nollan, supra,* the progenitor of *Indiana Coal,* seacost landowners wanted to build a permanent home to replace a cottage located on their land. The California Coastal Commission conditioned the issuance of its permit to do so upon the Nollans' granting the public an easement to pass across their beach, which was located between two public beaches. The Nollans were to receive no compensation therefor, only the permit. The Commission argued its requirement was not a "taking" under the Fifth Amendment, it was merely a restriction upon the use of the Nollans' property, i.e., a legitimate exercise of its police power. The Court rejected that argument, saying

> ... Perhaps because the point is so obvious, we have never been confronted with a controversy that required us to rule upon it, but our cases' analysis of the effect of other governmental action leads to the same conclusion. We have repeatedly held that, as to property reserved by its owner for private use, "the right to exclude [others is] 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.' " *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 3174, 73 L.Ed.2d 868 (1982), quoting *Kaiser Aetna v. United States,* 444 U.S. 164, 176, 100 S.Ct. 383, 391, 62 L.Ed.2d 332 (1979). In *Loretto* we observed that where governmental action results in "[a] permanent physical occupation" of the property, by the government itself or by others, see 458 U.S., at 432–433 n. 9, 102 S.Ct., at 3174–3175, n. 9, "our cases uniformly have found a taking to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner," *id.,* at 434–435, 102 S.Ct., at 3175–3176. We think a "permanent physical occupation" has occurred, for purposes of that rule, where individuals are given a permanent and continuous right to pass to and fro, so that the real property may continuously be traversed, even though no particular individual is permitted to station himself permanently upon the premises.

*Nollan,* 107 S.Ct. at 3145.

The Commission also argued the easement there requested was simply one part of a comprehensive program to provide continuous public access to the beach as the lots undergo development or redevelopment. In answer to that proposition, the Supreme Court said

> That is simply an expression of the Commission's belief that the public interest will be served by a continuous strip of publicly accessible beach along the coast. The Commission may well be right that it is a good idea, but that does not establish that the Nollans (and other coastal residents) alone can be compelled to contribute to its realization. Rather, California is free to advance its "comprehensive program," if it wishes, by using its power of eminent domain for this "public purpose," see U.S. Const.Amdt. V; but if it wants an easement across the Nollans' property, it must pay for it.

*Nollan,* 107 S.Ct. at 3150.

 Likewise here. Each proposed group house will be a permanent structure in the subdivision where each developer proposes to locate them, no mere easement is involved. Under *Nollan,* a "permanent physical occupation" will occur by a commercial structure which will be a multi-person, not a single family residence. Both these conditions violate each subdivision's covenants. Thus, the residents' Fifth Amendment rights would be violated if such occupation was to occur or continue unabated.

Patently, such "permanent physical occupation" is substantially more than a mere restriction upon the use of the residents' property. Even if the state was the moving party here, it would have to "pay for it", as was the case in *Nollan.* Because the statute makes no provision for payment, and private parties cannot condemn the property interests of other private property owners, amended Sec. 14 constitutes an invalid exercise of the state's police power, *Nollan, supra; Indiana Coal,*

*supra; Pulos, supra,* both as to the U.S. Constitution's Fifth Amendment and the Indiana Constitution's Article I, § 21. *Fountain Park Co. v. Hensler* (1927), 199 Ind. 95, 155 N.E. 465, 469.

Amicus briefs were filed in the Christole case by the Indiana Department of Mental Health and Community Residential Facilities Council and by the Association for Retarded Citizens of Indiana, Inc. The Department's brief raises an issue not raised by the parties herein, namely, whether recent amendments to the Federal Fair Housing Act, 42 U.S.C. 3601, et seq. have preempted this field vis-a-vis state legislation. We decline to address that issue because (a) the issue was not raised by the parties to this appeal, and (b) the parties have not been afforded an opportunity to brief it.

Reversed and remanded for further proceedings consistent with this opinion.

BUCHANAN, J., concurs.

MILLER, J., dissents with separate opinion.

MILLER, Judge, dissenting.

I dissent.

I believe it is unnecessary to reach the constitutional issues, because, in my view, a group home is a residential use, not a business use. The group homes in this case do not violate the restrictive covenants contained in the respective deeds. There is no dispute that both homes are the type of building—single family dwelling—permitted by the covenants. Further, the uses are residential and not the business uses prohibited by the covenants. The detailed reasons for my conclusion were expressed in my dissent in *Adult Group Properties,*

*Ltd. v. Imler* (1987), Ind.App., 505 N.E.2d 459. I will not repeat them here.[1] If constitutional issues were of significance in this appeal, I would find that case law mandates that the retroactive provision in the statute: (1) does not violate due process; and (2) does not unconstitutionally impair the residents' contracts because it is a legitimate and narrowly drawn exercise of the police power.

#### I. *Background*

In *Adult Group Properties,* the majority held that, in enacting IND. CODE § 16–13–21–14 (which purported to void restrictive covenants that "would permit the residential use of property but prohibit the use of that property as a residential facility for developmentally disabled or mentally ill persons," but contained no specific retroactive application), the legislature did not intend to void restrictive covenants which would prohibit group homes on the basis that they were business enterprises. In addition, the majority, relying on *Pulos v. James* (1973), 261 Ind. 279, 302 N.E.2d 768, indicated that to interpret the statute so as to void such covenants would be a violation of Article I, Sections 21 and 23 of the Indiana Constitution and the due process clause of the Fourteenth Amendment of the United States Constitution. However, *Adult Group Properties* did not contain an extensive discussion of the constitutional issue.

Following the decision in *Adult Group Properties,* the legislature amended I.C. § 16–13–21–14, to render void as against public policy existing restrictive covenants (effectively making the statute retroactive) which would prohibit group homes on the ground that the group home was a business, the residents were not related, or for

---

**1.** My position in this regard is not novel. The Missouri Supreme Court, in *Blevins v. Barry–Lawrence County Ass'n* (1986), Mo., 707 S.W.2d 407, found it unnecessary to consider whether a restrictive covenant which limited the use of property to residential purposes and single or double family dwellings was void pursuant to a statute similar to IND. CODE § 16–13–21–14, because the proposed group home was a residential use located in a single family dwelling type of structure. See also, cases cited in my dissent in *Adult Group Properties, supra.* More

recent support of this position is found in *Residential Management Systems, Inc. v. Jefferson County Plan Comm'n* (1989), Ind.App., 542 N.E.2d 227 and *Ayers v. Porter County Plan Comm'n* (1989), Ind.App., 544 N.E.2d 213, where this court held that group homes were a residential use and a "family" within the definitions in the respective zoning ordinances. The zoning ordinances defined a "family" as a group of individuals "living as a single housekeeping unit"—a far cry from a commercial enterprise.

any other reason. (The legislature also added IND. CODE § 16–13–21–14.1 which prospectively voided restrictive covenants based on the same grounds as those found in I.C. § 16–13–21–14, and therefore, does not concern us here.) This amendment (I.C. § 16–13–21–14) effectively destroys the primary basis for the decision in *Adult Group Properties*—that the legislature did not intend to void such covenants if they prohibited group homes as a business enterprise or as not being a "family" within the definitions of the covenants—and clarifies the legislative intent. However, the majority in *Adult Group Properties* also indicated without extensive discussion that, if the statute were construed to void such covenants, it would be unconstitutional. This is the issue before us.

Here, the majority concludes the statute violates the Fifth and Fourteenth Amendments of the U.S. Constitution and Article I, § 21 of the Indiana Constitution. The residents also claim the statute violates Article 1, § 10 of the U.S. Constitution [2] and Article 1, § 24 of the Indiana Constitution [3]—the contract clauses—and is unconstitutionally broad in its terms. The majority does not discuss these issues. Because I would hold that the statute is constitutional, I will also discuss these issues.

## II. *The Due Process Challenge*

The majority holds that the statute violates the due process clauses of the Fifth and Fourteenth Amendments and Article 1, § 21 of the Indiana Constitution, relying on *Pulos, supra,* to conclude that the statute results in a "taking" of property without due process or just compensation. However, *Pulos* is inapplicable to the circumstances in this case and contrary to more recent decisions of the United States Supreme Court and our supreme court.

In *Pulos* our supreme court held a statute which authorized a metropolitan plan commission to vacate restrictive covenants contained in the recorded plans of a subdivision was unconstitutional because it authorized the taking of property for a private purpose. The Marion County Plan Commission had vacated restrictive covenants which prevented commercial use of the property in the subdivision. The only parties who benefitted from the vacation of the covenants were owners who wished to use their property for commercial purposes. Our supreme court stated:

"The effect of the instant statute as applied to these facts is to extinguish this right as affecting the land described in the petition so far as found to exist in the respondents, *not for any public use nor to subserve any public end, but merely for the benefit of other private landowners whose estates are less valuable by reason of the existence of the right and who could make more advantageous and profitable uses of their own land if these encumbrances were out of the way.* It has been found expressly that the enforcement of the restrictions would 'not be injurious to the public interests.' That finding must be accepted as final and true. Each of the respondents is to be forced against his will to surrender his right in the nature of an easement in the land of another when it is not 'inoperative, illegal or void' according to the decision of the land court. He will be obliged to make surrender of this real estate right and accept money damages in place of it, *not because demanded by the public interests, but because a neighbor desires it for his private aims.* This is plain from the bald statement of the facts."

(emphasis in original) *Id.,* 302 N.E.2d at 773, quoting *Sprague v. Kimball,* 213 Mass. 380, 382, 100 N.E. 622, 624. The court then concluded:

Here the plaintiffs' property rights in the covenants of Meadowview have been purportedly taken and destroyed by the defendants pursuant to a statute of the State of Indiana for the sole use and benefit the defendants, i.e. their use of their land in Meadowview for business rather than residential purposes.

*Id.,* 302 N.E.2d at 774.

Clearly, the *Pulos* court was concerned with a "taking" for *private* purposes.

---

**2.** "No State shall ... pass any ... law impairing the obligations of contracts...."

**3.** "No *ex post facto* law or law impairing the obligation of contracts shall ever be passed."

Contrary to the majority's assertion, the case before us does not involve a taking for private purposes; it involves an exercise of the police power for the general welfare. Any benefits received by the operators of the group homes or the residents of such homes are purely incidental to the legitimate public purpose of the act. The mere fact that a statute may benefit private individuals does not render it unconstitutional, if its general purpose is public in nature. *Steup v. Indiana Housing Finance Authority* (1980), Ind., 402 N.E.2d 1215, 1221.

There can be no doubt that the legislature in enacting I.C. § 16-13-21-14 was addressing an area of broad public concern. As the Wisconsin supreme court in *Overlook Farms v. Alternative Living Services* (1988), 143 Wis.2d 485, 422 N.W.2d 131, 136 (a case dealing with the constitutionality of a statute similar to I.C. § 16-13-21-14) stated:

> Without legislation such as this, the elderly, handicapped and mentally retarded would be forced either to live alone where they cannot sufficiently care for themselves, or be unnecessarily instutionalized where, according to expert testimony, the patients
>
> > give up their independence, they are subject to regulations and specific requirements of living in an institution like a nursing home, become very depressed, sometimes stop eating, sometimes they become ill, only from the fact that they are at the wrong level of care, not to mention that it's very expensive to maintain someone in a nursing home, if they don't need it.
>
> We would be remiss to hold that legislation directed at ameliorating such effects is not a significant and legitimate public

purpose directed at a broad health and social problem.

In addition, Congress has recently evidenced a similar concern with the problems of handicapped citizens by enacting the Federal Fair Housing Amendments Act, 42 U.S.C. § 3601, *et seq.*, which outlaws discrimination in housing based on an individual's handicap.

The State has a legitimate interest in the health and welfare of its handicapped citizens. This interest is a far cry from the purely private concerns involved in *Pulos, supra.*

Finally, although there is language in *Pulos* which suggests that such a statute even if enacted for a public purpose would be unconstitutional,[4] this language is mere *dicta,* and is neither the most recent nor the most extensive explication of our supreme court's position on this issue.

In *Department of Natural Resources v. Indiana Coal Council,* 542 N.E.2d at 1001, our supreme court extensively discussed the meaning of "taking" within the context of the due process clauses in light of the numerous Supreme Court's decisions on the question. In *Dep't of Natural Resources,* 6.57 acres of a 305 acre farm (the entire farm contained approximately 1.537 million tons of mineable coal) were designated by the Department of Natural Resources (DNR) as unsuitable for surface mining because the 6.57 acres contained "an archaelogically significant area, rich in cultural deposits with substantial historic and scientific value." *Id.* at 1001. The owner of the farm and the Indiana Coal Council challenged the DNR's action on the basis that it was an unconstitutional taking of property.

Our supreme court explained that in determining whether an unconstitutional tak-

---

4. The language is as follows:

"Even if we should attempt to uphold the constitutionality of the provision in question upon the premise that the commission was authorized to act thereunder only for the public good and not to benefit private individuals, we would, nevertheless be without support. No provision has been made to compensate those owners of other lots within the plat. It was for their benefit that the restrictive covenants were imposed. Their right to have

them enforce is a property right and may not be taken from them without just compensation. Thus, even if it were maintained that the vacation of the restrictions was for the public good, we would run afoul of sections 21 and 23 of Article I of our state constitution (supra) and the due process clause of the Fourteenth Amendment to the Constitution of the United States (supra)."

*Pulos,* 302 N.E.2d at 774.

ing has occurred, the court applies a two prong test: (1) Whether the legislation substantially advances a legitimate state interest; and (2) Whether it deprives an owner of economically viable use of his property. The court explained:

> The essence of the first prong of the test is whether government had the right to exercise its police power in the manner it did, regardless of the burden to the property. Or, in other words, it asks the question: has government regulated where it should not have done so? If the regulation does not bear a substantial relation to the legitimate ends sought to be achieved, either through a failure of the statute as a whole to serve those ends or as applied to a particular piece of property, then the exercise of the police power is deemed to be unreasonable.

> \* \* \* \* \* \*

The economic inquiry of the second prong of the test has its roots in Justice Holmes's decision in *Pennsylvania Coal [v. Mahon]*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 [1922], which is generally regarded as the seed from which all modern regulatory taking cases have grown. In that case, a Pennsylvania statute requiring that a certain amount of coal be left unmined so as to prevent subsidence to the surface estate was struck down as unconstitutional because it interfered with the distinct investment-backed expectations of the owners of the mineral estate and did not provide compensation for the coal that was "taken." This consideration for distinct investment-backed expectations remains essential today. *Penn Central [Transportation Co. v. City of New York]*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631, 648 [1978]; *Kaiser Aetna v. United States*, 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332, 343 (1979). It is also necessary to examine the economic impact of the regulation on the claimant in terms of the diminution in value of the land, *id.*, and the extent of any interference with the present use of the land, *Penn Central*, 438 U.S. at 136, 98 S.Ct. at 2665, 57 L.Ed.2d at 656. In determining the degree of diminution in value, the particular segment that is affected is not considered alone, but the claimant's property as a whole is compared to that portion which is encumbered. *Keystone [Bituminous Coal Ass'n v. DeBenedictis]*, 480 U.S. [470] at 497, 107 S.Ct. [1232] at 1248, 94 L.Ed.2d [472] at 496 [1987]. Of course, the nature and character of the interference is also relevant; and where a regulation results in permanent physical occupation of property, a taking will almost invariably be found. *Id.*, 480 U.S. at 488–489 n. 18, 107 S.Ct. at 1244 n. 18, 94 L.Ed.2d at 490 n. 18; *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982).

*Id.* at 1003.

The court then concluded the regulation was not an unconstitutional taking because the economic impact was comparatively small and "[p]rotecting our national and state heritage through the preservation of archaeological sites must be included in this broad spectrum of legitimate interests of government." *Id.* at 1005.

If the State has a legitimate interest in protecting the artifacts of the dead, it surely has a legitimate interest in protecting the health and welfare of its living handicapped citizens. In addition, the statute in question here bears a substantial relation to the ends sought to be achieved. In IND. CODE § 16–13–21–1 to 19 the legislature has enacted a detailed statutory and regulatory scheme for "mainstreaming" handicapped individuals into normal family environments. I.C. § 16–13–21–14 is substantially related to this goal. Therefore, the statute does not violate the first prong of the test. It is legislation substantially related to a legitimate state interest.

Turning to the second prong of the test, it is necessary to recognize that the economic impact on the property must be such that "a land owner has been effectively deprived of productive use of his property." *Id.* 542 N.E.2d at 1003. It is important to recognize that *Dep't of Natural Resources* involves a restriction on the use of the

party's *own* property, as do virtually all of the cases dealing with this issue. *See Penn Central Transportation Co. v. City of New York* (1978), 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631[5] and cases cited therein. Contrary to the majority's assertion, the case at bar does not involve a restriction on the use of the *residents'* property, nor does it result in "a permanent physical occupation" of *their* property. The residents may continue to use their property for residential purposes. In addition, unlike the circumstances in *Nollan v. Calif. Coastal Comm'n* (1987), 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 no portion of their property is being occupied (even temporarily) by the group homes. The governmental action in this case is far less intrusive than the action in *Dep't of Natural Resources*. The use of the resident's property has not been affected in the slightest degree. Therefore, the statute is not an unconstitutional taking of property.

### III. *Impairment of Contract—Retroactive Effect of the Statute*

The residents also claim the statute violates the contract clauses in Article I, § 10 of the United States Constitution[6] and Article I, § 24 of the Indiana Constitution[7] because its retroactive effect impairs the provision of their covenants.

As Judge Shields explained in *Wenke v. City of Indianapolis* (1981), Ind.App., 429 N.E.2d 295, 298.

> A retrospective application of a statute to a contract entered into before the effective date of that statute can impair contractual obligations contrary to both the United States and Indiana Constitutions. U.S. Const. Art. 1 § 10; Ind. Const. Art. 1 § 24. There are, however,

exceptions to the general rule. The prohibition against impairment of contracts is not an absolute one. The contract clause of either constitution does not restrict the exercise of the state's police power to protect the public health, safety, and welfare. *Finerty v. State ex rel. School City of Gary,* (1938) 213 Ind. 470, 12 N.E.2d 941.

In *Allied Structural Steele Co. v. Spannaus* (1978), 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727, the United States Supreme Court established a two-step analysis for determining whether a statute violates the contract clause. The first step requires a determination of "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." *Id.* at 244, 98 S.Ct. at 2722. If the impairment is minimal the inquiry ends at this point and the law is constitutional. However, if a substantial impairment is found, the court moves to the second step which involves an examination of the nature and purpose of the statute. *Id.* at 245, 98 S.Ct. at 2723.

Before applying step one, it is necessary to note the standard to be applied when considering the constutionality of a statute. A statute is presumed to be constitutional and the challenger has the burden of rebutting the presumption. *Miller v. State* (1987), Ind., 517 N.E.2d 64. All reasonable doubts are resolved in favor of the statute's constitutionality. *Id.* Therefore, the residents carry a heavy burden in order to rebut the presumption of constitutionality.

Here, in the Christole group home case, the only evidence presented by the residents which they claim shows an impairment of their contract expectations, was

---

**5.** In *Penn Central,* the owners of Grand Central Station in New York City sought to erect a 55–story office building above the existing station. Permission to erect the building was denied pursuant to New York City's Landmarks Preservation Law, because the building would destroy the architectural and aesthetic value of the station. The Court held that even though the owners would lose substantial revenue because they could not erect the building, no taking had occurred, because they could continue to gainfully use the station. The state's interest in maintaining the historical value and architec-

tural integrity of a building outweighed the owners' expectation of substantial profit. Again, I observe that, if the state has a legitimate interest in protecting inanimate objects, it must necessarily have a greater interest in protecting its living needy, elderly, and handicapped citizens.

**6.** "No State shall . . .; pass any . . . Law impairing the Obligation of Contracts."

**7.** "No *ex post facto* law, or law impairing the obligation of contracts shall ever be passed."

evidence that on Wednesday evenings seven to thirteen cars were parked on the property and the adjoining street, thereby increasing traffic and the number of cars parked on the street. Christole responded that staff meetings were held every other Wednesday evening, which resulted in a maximum of thirteen cars parked in the area. I note that it is not unusual for residents to hold meetings (i.e., bridge clubs, Bible study classes) in their homes resulting in a similar increase in traffic and parked cars. This evidence is unpersuasive and, at best, shows a minimal impairment.[8] Therefore, the inquiry ends. *Allied Structural Steele, supra.* The residents have failed to meet their burden of rebutting the presumption of constitutionality.

However, in the Hopewell Center case, the residents presented evidence in the form of an affidavit of a real estate appraiser, who stated he had made two studies on the impact of group homes on the surrounding neighborhood and a specific study on the impact of the Hopewell group home on its surrounding neighborhood, and had concluded that the presence of the Hopewell group home would reduce the value of surrounding property between 20% and 5%, depending on the proximity of the individual surrounding homes to the group home. The evidentiary value of this affidavit is questionable.

When reviewing a grant of summary judgment, this court applies the same standard as the trial court. *Sharp v. Indiana Union Mutual Insurance Co.* (1988), Ind. App., 526 N.E.2d 237. Ind. Rules of Procedure, Trial Rule 56(E) states: "Supporting

and opposing affidavits shall be made on personal knowledge, *shall set forth such facts as would be admissable in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.*" (Emphasis added) Although the affiant states that he is a licensed real estate broker, has taken classes in appraisal, attended numerous seminars on appraisal[9] and conducted several thousand appraisals, the affidavit completely fails to show that the affiant has any training or competence in conducting studies or analysis of any kind on the impact of including one type of use in an area with a different use, including the impact of group homes on the surrounding property. In addition, the affidavit contains no facts from which the court could determine the validity of the studies. The affiant merely states that he "has checked through sources available to him, market values, marketing time and made detailed studies of the before and after effects of the placement of these facilities." The court is not informed of the nature of the "sources available to him," nor of the extent of his checking of market values and marketing time. For all the affidavit shows, he could have checked five properties or hundreds of properties. In addition, the court does not know if he eliminated other variables which might affect the value of surrounding property. The affiant has simply stated an opinion, supported by studies, which studies are unsupported by any facts which would show either the validity of the studies or his competence to conduct them and evaluate the results.[10]

---

8. There was no evidence that the increased traffic impaired the value of the surrounding property. I note that a family with three high school-age children "with wheels" would increase the traffic in the neighborhood, but would not be a violation of the covenants.

9. The affiant states these seminars were conducted by the Society of Real Estate Appraisers and the Institute of Real Estate Appraisers (I assume he was referring to the American Institute of Real Estate Appraisers). Although he states he has attended these seminars, he does not state that he is a member of these organizations or has been designated by them as an expert appraiser or survey analyst, nor does he

allege that the content of these seminars related to conducting surveys.

10. Two cases involving expert opinions on community standards in the context of obsenity prosecutions are instructive. In *Albright v. State* (1986), Ind.App., 501 N.E.2d 488, this court held that an expert in the field of sexual dysfunction was not shown to be qualified to testify as an expert on general community standards. Here, the affiant has shown that he is competent to appraise specific property, but has failed to show he is competent to conduct or analyze studies.

Further, as Judge Shields explained in *Saliba v. State* (1985), Ind.App., 475 N.E.2d 1181, 1187–

As this court stated in *Interstate Auction, Inc. v. Central National Insurance Co.* (1983), Ind.App., 448 N.E.2d 1094, 1101, "a court considering a motion for summary judgment should disregard inadmissible information contained in supporting or opposing affidavits." This information was inadmissible and should be ignored. Therefore, the residents in the Hopewell case have also failed to show more than a minimal impairment of their contract.

However, even if we were to consider the opinion contained in the affidavit and were to consider it evidence of substantial impairment of the contract, the law is not unconstitutional. A finding of substantial impairment merely requires a consideration of the nature and purpose of the statute. *Allied Structural Steele, supra.*

The statute in question advances a legitimate state interest. In addition, the statutory and regulatory restrictions placed on group homes by I.C. § 16–13–21–1 *et seq.* carefully control the operation of such group homes and insure that they maintain a residential character. *See* I.C. § 16–13–21–10. In this case, the legitimate state interest outweighs any resulting impairment of the residents' contract rights. *See Overlook Farms, supra* (even though there was substantial impairment of contract, state's interest in welfare of elderly and handicapped outweighed residents' contract rights).

### IV. *Overbreadth*

Finally, the residents argue that the inclusion of the words "for any other reason" in I.C. § 16–13–21–14 render the statute unconstitutional because such language is vague and overbroad. The residents claim these words would allow group homes to violate restrictive covenants related to the

88, in discussing the admissibility of surveys (public opinion polls):

> The admissibility of a public opinion poll depends primarily upon the presence of circumstantial guarantees of trustworthiness. 1 J. Moore, *Moore's Federal Practice* 2.712 (1982). Public opinion polls are surveys designed to elicit the state of mind of a targeted population ("universe") through an examination of a representative portion ("sample") of the universe. Through accepted statistical analysis, the sample data is used to project the opinion of the entire targeted population. In short, the circumstantial guarantees of trustworthiness are premised on (1) the use of generally accepted surveying techniques in conducting the poll and (2) adherence to statistically correct methods in conducting the poll and evaluating the results.
>
> This twofold inquiry has led to the judicial development of six foundational criteria which are generally accepted as scientifically necessary to insure a poll's reliability and, consequently, its admissibility. The proponent of a poll has the burden of establishing: (1) the poll was conducted by an expert in the field of surveying; (2) the relevant universe was examined; (3) a representative sample was drawn from the relevant universe; (4) the mode of questioning was "correct" (mail, telephone, personal interview, etc.); (5) the sample, questionnaire, and the interview were designed in accordance with generally accepted standards; (6) the data gathered was accurately reported; and (7) the data was analyzed in a statistically correct manner. J. Moore, *supra* at 138; *accord Baumholser v. Amax Coal Co.*, 630 F.2d 550, 552 (7th Cir.1980). The adherence to this generally accepted methodology renders the poll's results admissible in the form of expert opinion.

Although some of these criteria may be inapplicable to this kind of study, certainly it must be shown that: (1) the data was compiled in accordance with generally accepted standards; (2) the data gathered was accurately reported; and (3) the data was analyzed in a statistically correct manner. Here, we are hampered in determining if the other criteria apply because we do not know the source of or type of data relied upon.

In *Duncan v. George Moser Leather Co.* (1980), Ind.App., 408 N.E.2d 1332, this court discussed the admissibility of expert opinion testimony based upon reports not in evidence or which are inadmissible under the hearsay rule. The court explained:

> In order for the opinion to be admissible (1) the expert must have sufficient expertise to evaluate the reliability and accuracy of the report, (2) the report must be of a type normally found reliable, and (3) the report must be of a type customarily relied upon by the expert in the practice of his profession or expertise. *Smith v. State, supra* [ (1972), 259 Ind. 187, 285 N.E.2d 275]; *Capital Improvement Board of Managers v. Public Service Commission, supra* [ (1978), 176 Ind.App. 240, 375 N.E.2d 616]; *In re Adoption of Lockmondy* (1976), 168 Ind.App. 563, 343 N.E.2d 793; *Rosenbalm v. Winski, supra* [ (1975), 165 Ind. App. 378, 332 N.E.2d 249].

*Id.* at 1343.

I note that, here, the studies relied upon by the affiant are not in evidence and the affidavit fails to show that the studies and opinion based on them meet these criteria.

type of structure allowed, lot size or set back restrictions. This argument is meritless.

A statute must be construed so as to render it constitutional. *Miller, supra.* In *Ayers v. Porter County Plan Commission* (1989), Ind.App., 544 N.E.2d 213 (a case involving a zoning authority's right to require a group home to seek a special exception) we suggested that a zoning authority could require a group home to comply with structural requirements such as type of building (i.e., single family), lot size or set back requirements.

Restrictive covenants relating to property are analogous to zoning restrictions in the sense that they are generally of two types: (1) restrictions on use of the property; and (2) restrictions on the type of structures permitted. *See* 101 A. C.J.S. "Zoning and Land Planning" § 2. I note that the provisions of this statute (I.C. 16–13–21–1, *et seq.*) concerning both restrictive covenants and zoning ordinances preclude the exclusion of group homes because they are allegedly used as a business or because the residents are not related. This indicates that the legislature was concerned with restrictions based on use. In addition, two other sections of the statute (I.C. 16–13–21–11.5 and § 16–13–21–12) provide that "[t]he residential facility may be required to meet all *other* zoning requirements, ordinances and laws." Reading the statute as a whole, it is clear the legislature did not intend to void restrictive covenants based on structural requirements, nor to permit group homes to ignore laws and ordinances with respect to health codes and building restrictions. *See Ayers, supra.* Therefore, it is unnecessary to consider whether such a law would be constitutional.

I would hold that I.C. § 16–13–21–14 is constitutional and would affirm the trial courts.