Tim & Judy CLEM, et al., Appellants
(Plaintiffs Below),

v.

CHRISTOLE, INC., Appellee
(Defendants Below).

James M. RICHARDS, et al., Appellants
(Plaintiffs Below),

v.

HOPEWELL CENTER, INC., Appellee
(Defendants Below).

No. 53S04–9112–CV–950.

Supreme Court of Indiana.

Dec. 4, 1991.

Philip C. Hill, Len E. Bunger, Bloomington, for appellants Tim and Judy Clem, et al.

Michael R. Withers, Anderson, for appellants James M. Richards, et al.

Thomas N. Olvey, Schnorr Good & Olvey, Indianapolis, Gary J. Clendening, Harrell Clendening & Coyne, Bloomington, for appellee Christole, Inc.

Scott Webb, Anderson, for appellee Hopewell Center, Inc.

Linley E. Pearson, Atty. Gen., Brenda Franklin Rodeheffer, Indianapolis, for amicus curiae, Indiana Dept. of Mental Health and Community Residential Facilities Council.

Ernest M. Beal, Jr., Fort Wayne, for amicus curiae, Ass'n for Retarded Citizens of Indiana, Inc.

ON JOINT PETITION TO TRANSFER

DICKSON, Justice.

In this consolidated appeal, the plaintiffs-appellants, residential subdivision property owners, are appealing from grants of summary judgment permitting the defendants-appellees, developers of group homes for developmentally disabled persons, to operate such homes in the residents' subdivisions. The Court of Appeals reversed, finding that the statutory provisions purporting to invalidate certain subdivision restrictions were unconstitutional. *Clem v. Christole, Inc.* (1990), Ind.App., 548 N.E.2d 1180.

The appellees jointly petition for transfer, asserting that Ind.Code § 16–13–21–14 (since repealed, effective January 1, 1992,

Ind.Pub.L. No. 9–1991, § 98)[1] is a valid and constitutional exercise of the state's police power. Enacted in 1988, the statute provides:

(a) This section applies to each restriction, reservation, condition, exception, or covenant that is created before April 1, 1988, in any subdivision plat, deed, or other instrument of, or pertaining to, the transfer, sale, lease, or use of property.

(b) A restriction, reservation, condition, exception, or covenant in a subdivision plat, deed, or other instrument of, or pertaining to, the transfer, sale, lease, or use of property that would permit the residential use of property but prohibit the use of that property as a residential facility for developmentally disabled or mentally ill persons:

(1) on the ground that the residential facility is a business;

(2) on the ground that the persons residing in the residential facility are not related; or

(3) for any other reason;

is, to the extent of the prohibition, void as against the public policy of the state.

Ind.Code § 16–13–21–14.

The decision of the Court of Appeals was based upon its conclusion that the statute constitutes a prohibited taking in violation of the Fifth and Fourteenth Amendments of the United States Constitution and Article 1, Section 21 of the Indiana Constitution. *Clem,* 548 N.E.2d 1180. A few months later, Judge Miller, who dissented in *Clem,* wrote for the majority in *Minder v. Martin Luther Home Foundation* (1990), Ind.App., 558 N.E.2d 833. *Minder* addressed the same question as *Clem,* but reached the opposite conclusion. Because of these conflicting decisions, we grant transfer.

In the first of the two consolidated cases, Defendant–Appellee Christole, Inc. (Christole), a not-for-profit corporation licensed and regulated by the Indiana Department of Mental Health, purchased a single-fami-

---

1. Prior to the 1988 amendments, Ind.Code § 16–13–21–14 (West 1984) did not specify retroactive application. Such language was added follow-

ing *Adult Group Properties, Ltd. v. Imler* (1987), Ind.App., 505 N.E.2d 459.

ly residence in Fairwood Terrace Addition in Bloomington, Indiana, for use as a group home for the care of five unrelated developmentally disabled autistic children to be supervised by thirteen full and part-time staff members. Plaintiffs Tim and Judy Clem, along with other residents of Fairwood Terrace, sought injunctive relief alleging Christole was in violation of the restrictive covenants prohibiting the use of buildings "for business or commercial purposes of any kind," and providing that the one single-family dwelling allowed per lot "may be used for single-family or two family dwellings."

In the second consolidated case, Defendant–Appellee Hopewell Center, Inc. (Hopewell) purchased a single-family residence in Mustin Manor subdivision in Anderson, Indiana, for use as a facility for the developmentally disabled or mentally ill, which would house eight unrelated adult persons continuously and permanently supervised by a staff of one or more persons. The Plaintiff–Appellant James M. Richards and other owners of residential lots in Mustin Manor subdivision sought injunctive relief to prevent Hopewell from modifying the existing residential structure for such purposes, alleging that such use would violate the existing restrictive covenants.[2]

In each of these two cases, the trial courts granted summary judgment for the defendant group home, applying Ind.Code § 16–13–21–14(a) to prohibit the enforcement of restrictive covenants which prevent the operation of a residential facility for developmentally disabled persons.

While numerous issues are presented and argued by the parties, we find a single issue determinative: whether retroactive application of the statute violates the contract clause embodied in Article 1, Section 24 of the Indiana Constitution:

No ex post facto law, or law impairing the obligation of contracts, shall ever be passed.

■ Restrictive covenants are contract rights subject to the Indiana contract clause. *Adult Group Properties, Ltd. v. Imler* (1987), Ind.App., 505 N.E.2d 459. In *Pulos v. James* (1973), 261 Ind. 279, 302 N.E.2d 768, this court treated restrictive covenants as contracts, and stated:

Although the defendants correctly state that the Legislature may prohibit contracts that are against public policy, it, nevertheless, may not impair previously legal contracts after the rights thereunder have vested.

261 Ind. at 290, 302 N.E.2d at 775.

■ However, it has long been recognized that the prohibitions contained in the Indiana contract clause do not necessarily restrict the exercise of the State's power to protect the public health, safety, and general welfare. *Finerty v. State ex rel. School City of Gary* (1938), 213 Ind. 470, 12 N.E.2d 941 (public school corporation did not have vested contract right to receive county dog tax fund surplus collected pursuant to prior statute later amended to alter the distribution).

[T]he prohibition as to impairment of contract obligations does not extend to subjects affecting the health, safety or general welfare of the public.

*Grand Trunk W. Ry. Co. v. City of South Bend* (1910), 174 Ind. 203, 222, 91 N.E. 809 (ordinance granting right to construct and use railroad tracks across city streets may be repealed). Valid existing contracts cannot be impaired by future legislation "except in a proper exercise of the police power of the state." *Bruck v. State ex rel. Money* (1950), 228 Ind. 189, 198, 91 N.E.2d 349, 352 (statute imposing mandatory retirement upon existing permanent and indefinite teacher contracts contrary to contract clause and not valid as exercise of police power). The police power of the state is "the power inherent in a government to enact laws, within constitutional

---

**2.** Among the Mustin Manor restrictive covenants were the following provisions:

1. LAND USE AND BUILDING TYPE. No lot shall be used except for residential purposes. No buildings shall be erected, altered, placed or permitted to remain on a lot, other than one detached single-family dwelling not to exceed two (2) stories in height and a private attached garage for not more than two (2) cars. No building unattached to dwelling shall be permitted. No lot shall be replatted or subdivided.

limits, to promote the order, safety, health, morals, and general welfare of society." *Id.*

▉ Notwithstanding the general rule of construction favoring the interpretation of statutes as constitutional, *Miller v. State* (1987), Ind., 517 N.E.2d 64; *Short v. Texaco, Inc.* (1980), Ind., 406 N.E.2d 625, we cannot ignore the clear mandate of our state constitution limiting the power of legislation to impair the obligation of contracts. If the police power exception is construed too broadly, it would operate to eviscerate the constitutional protection. Virtually every legislative enactment could arguably be related to order, safety, health or welfare as a justification for legislative interference with pre-existing contractual rights and duties.

> In determining whether legislation is violative of constitutional restraints the courts will confine themselves to the question, not of legislative policy, but of legislative power. The law must not be arbitrary, unreasonable or patently beyond the necessities of the case. The legislature may not under the guise of protecting public interests arbitrarily interfere with private business or impose unnecessary restrictions upon lawful occupations. If the law prohibits that which is harmless in itself, or if it is unreasonable and purely arbitrary, or requires that to be done which does not tend to promote the health, comfort, morality, safety or welfare of society, it is an unauthorized exercise of power.

*Dep't of Financial Institutions v. Holt* (1952), 231 Ind. 293, 301–02, 108 N.E.2d 629, 634. Legislation which does invade freedom of contract "can only be sustained as a valid exercise of the police power if it both relates to the claimed objective and employs means which are both reasonable and reasonably appropriate to secure such objective." *Holt,* 231 Ind. 293, 305, 108 N.E.2d 629, 635. In *Kirtley v. State* (1948), 227 Ind. 175, 181, 84 N.E.2d 712, 714, we stated:

If the law prohibits that which is harmless in itself, or requires that to be done which does not tend to promote the health, comfort, morality, safety or welfare of society, it will be an unauthorized exercise of power, and upon proper presentation it is the duty of the courts to declare such a law void.

In *Wencke v. City of Indianapolis* (1982), Ind.App., 429 N.E.2d 295, Judge Shields provides the following perspective:

> A retrospective application of a statute to a contract entered into before the effective date of that statute can impair contractual obligations contrary to both the United States and Indiana Constitutions. There are, however, exceptions to the general rule. The prohibition against impairment of contracts is not an absolute one. The contract clause of either constitution does not restrict the exercise of the state's police power to protect the public health, safety, and welfare. In order to justify the impairment of a contractual obligation, there must be a necessity for the legislation and the legislation must be reasonable under the circumstances.

429 N.E.2d at 298 (citations omitted).

We also find helpful guidance from the reasoning employed in *Allied Structural Steel Co. v. Spanaus* (1978), 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727, which reviewed the federal counterpart [3] to our contract clause in Article 1, Section 24 of the Indiana Constitution.

> If the [federal] Contract Clause is to retain any meaning at all, however, it must be understood to impose *some* limits upon the power of a State to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power.

438 U.S. at 242, 98 S.Ct. at 2721, 57 L.Ed.2d at 734 (emphasis in original). In *Spanaus* the Supreme Court identified the first inquiry as determining whether, and to what extent, the state law operated as a substantial impairment of a contractual relation-

---

**3.** "No State shall ... pass any ... Law impairing the Obligation of Contracts." U.S. Const., Art I, § 10.

ship, noting that the severity of impairment may be measured by "factors that reflect the high value the Framers placed on the protection of private contracts." 438 U.S. at 245, 98 S.Ct. at 2723, 57 L.Ed.2d at 737.

> Contracts enable individuals to order their personal and business affairs according to their particular needs and interests. Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them.

*Id.* The Court considered whether the "disruption of contractual expectations was necessary to meet an important general social problem," and whether the law was "enacted to protect a broad societal interest rather than a narrow class." 438 U.S. at 249, 98 S.Ct. at 2724, 57 L.Ed.2d at 739. In addition, the Supreme Court considered whether in enacting the statute the legislature was entering a field it had never before sought to regulate. Invalidating a Minnesota law under the federal Contract Clause, the opinion concluded in part:

> The law was not even purportedly enacted to deal with a broad, generalized economic or social problem. It did not operate in an area already subject to state regulation at the time the company's contractual obligations were originally undertaken, but invaded an area never before subject to regulation by the State. It did not effect simply a temporary alteration of the contractual relationships of those within its coverage, but worked a severe, permanent, and immediate change in those relationships—irrevocably and retroactively.

438 U.S. at 250, 98 S.Ct. at 2725, 57 L.Ed.2d at 740 (citations omitted).

■ Our General Assembly is empowered to enact laws in the exercise of the police power of the state. However, simply because a statute is a valid exercise of legislative authority pursuant to such general police power does not necessarily immunize it from our state constitution's contract clause. Only those statutes which are necessary for the general public and reasonable under the circumstances will withstand the contract clause. It is only

this latter *necessary* police power, rather than the *general* police power, which provides the exception to the contract clause.

■ We recognize that the state's *general* police power authorizes the legislature's enactment of laws which promote the mainstreaming of developmentally disabled persons by prohibiting *future* subdivision contract restrictions which permit residential use but prohibit use by a residential facility for such persons. However, statutory impairment of *existing* restrictive covenants does not fall within the *necessary* police power exception to the contract clause because of the absence of societal necessity.

When juxtaposed against the broad and explicit mandate of the contract clause in Article 1, Section 24 of the Indiana Constitution, we find that the legislative justification for Ind.Code § 16–13–21–14 fails to fall within the necessary police power exception. Notwithstanding the social utility in providing homes for the developmentally disabled in ordinary residential areas and the resulting indirect societal benefits, several countervailing considerations compel our decision. The enactment is not reasonably necessary for the protection of the health, safety, and welfare of the general public. It does not address a broad problem general to society. Its effect is not temporary but permanent, irrevocable, and retroactive in altering the contractual relationships created in restrictive covenants. The provision imposes statutory regulation in a field not traditionally subject to legislation. In seeking to alter the enforceability of restrictive covenants, the statute represents a considerable impairment of contractual obligations.

Restrictive covenants permit property owners to collectively provide or obtain protections significantly contributing to the peace, safety, and well-being of themselves and their families. These purposes are consistent with values identified in our Indiana Constitution. Article 1, Section 1 expressly recognizes that government is instituted for the peace, safety, and well-being of the people. Article 1, Section 31 protects the right of citizens to assemble

together in a peaceable manner to consult for their common good.

Application of these considerations leads us to conclude that the statute falls outside of the necessary police power exception to the contract clause, Art. I, Section 24, of the Constitution of Indiana.

The summary judgments granted by the trial courts in favor of both Christole and Hopewell were based upon the retroactive application of Ind.Code § 16–13–21–14, which we have just determined is constitutionally prohibited.

As to the cause of action brought by the Clems and other Fairwood Terrace residents against Christole, the trial court initially granted the plaintiffs' motion for summary judgment, finding the covenant restricting the use of a building to a single-family dwelling enforceable against the defendant and applicable to the structure and to the use of the lot. Following the Indiana General Assembly's 1988 adoption of Ind.Code § 16–13–21–14, however, the Court of Appeals remanded the case to the trial court for consideration of the effect of the 1988 enactment. The trial court then vacated its prior order and found the statute applicable. The initial decision of the trial court correctly determined that the Christole group home, a residential facility for five unrelated persons, violated the restriction. *See Imler*, 505 N.E.2d at 467.

The same result is required in the second case, involving the action by Richards and other residents of Mustin Manor subdivision against Hopewell. In granting summary judgment, the trial court found that the restrictive covenants "would clearly operate to prohibit" Hopewell's use of its lot "as a residential facility for developmentally disabled persons." The subdivision's restrictive covenants demand that no buildings shall be permitted to remain on any lot other than one detached single-family dwelling. Eight unrelated adults were to reside in the Hopewell group home. As in the Christole facility, this constituted a violation of the applicable restrictive covenants.

Transfer is granted. The summary judgments entered in favor of Christole and Hopewell and against the plaintiffs are each now reversed. This cause is remanded to the respective trial courts for further proceedings consistent with this opinion.

SHEPARD, C.J., and GIVAN, J., concur.

KRAHULIK, J., dissents with opinion in which DeBRULER, J., concurs.

KRAHULIK, Justice, dissenting.

I must dissent from the majority position. I believe that:

(1) The homes at issue are not violative of the restictive covenants; and

(2) Regardless of the aforementioned, IND. CODE § 16–13–21–14 was a proper exercise of state police powers.

### I.  *Restrictive Covenants*

Plaintiffs–Appellants, the residential subdivision property owners, argue that the homes developed by Christole and Hopewell violate certain restrictive covenants in their deeds that prohibit structures other than single or two-family dwellings, and/or commercial activity within the subdivisions. Restrictive covenants typically found in residential deeds are generally aimed at two purposes—controlling the structure's design and appearance, and controlling the structure's use. The homes at issue in this case do not infringe upon either of those objectives.

The deeds in both the Fairwood Terrace and Mustin Manor subdivisions make reference to "single family" or "single and two-family" dwellings. Neither deed purports to define "family." Logically, single family was chosen as a modifier to describe the intended use and thus the design of the structure rather than to profile the persons who could occupy it. Additionally, proscriptions in the deeds regarding the size and height of the structures permitted suggest that the drafters of the restrictive covenants were greatly interested in limiting the design and appearance of the buildings in the subdivision. Therefore, "single family" is used in this sense to define the structure's design; that is, it must be designed and constructed with the intention

that it will be used as a dwelling by a single housekeeping unit.

Because the purpose of the Hopewell and Christole homes is to integrate into a typical residential setting to as great an extent as possible, the structure will in no way disturb the physical continuity of the neighborhood. Thus, the homes cannot be said to violate the covenant's goal of controlling design and structure.

The second purpose behind the restrictive covenants is to control the use of the buildings in the subdivisions. By specifying "single-family homes" and by expressly prohibiting commercial enterprises, the drafters intended that the structures within the subdivisions would be used by single housekeeping units for dwelling purposes. This is the intention of both Christole and Hopewell. The purpose of both organizations is to provide a dwelling for a housekeeping unit, not to engage in trade or commerce on the real estate. Opponents argue that the group homes are, nonetheless, prohibited business or commercial enterprises.

Black's Law Dictionary defines business as "employment, occupation, profession, or commercial activity engaged in for gain or livelihood." *Black's Law Dictionary* 179 (5th ed.1979). Commercial is defined as "[relating] to or connected with trade and traffic or commerce in general, ... [g]eneric term for most all aspects of buying and selling." *Id.* at 245. Using these definitions and taking the covenants in their broadest meaning, they could be said to prohibit not only the not-for-profit activities of Hopewell and Christole, but also the for-profit activities that typically occur in neighborhood homes. Mrs. Smith could no longer provide daycare service in her home; Mr. Jones could not continue his weekend business of repairing and selling antique cars in his garage; the Browns would not be allowed to use the office in their spare bedroom to sell real estate; garage sales and charity fundraising parties would be strictly forbidden. Because there is no evidence that these covenants have ever been or were ever intended to be read so broadly, they must be read in a more narrow fashion.

Residents of the subdivisions might argue that the presence of the group homes may lead to increased traffic and other nuisances. Of course, the same result could occur if our fictional homeowner were to rent his home to several college students, or if he were to himself live in the home with a large family, including teenage children, each with his own car and friends. Drafters of restrictive covenants wishing to address issues such as noise levels and the number of permissible guests should do so explicitly such that the provision is applied equally to all.

My belief that group homes, such as those in question here, are not violative of restrictive covenants that allow only single-family dwellings, or prohibit commercial activities is not novel. This position has been espoused by Judge Ratliff in his dissent in *Metropolitan Development Commission v. Villages, Inc.* (1984), Ind.App., 464 N.E.2d 367, as well as by Judge Miller in his dissents in *Adult Group Properties, Ltd. v. Imler* (1987), Ind.App., 505 N.E.2d 459, and *Clem v. Christole, Inc.* (1990), Ind.App., 548 N.E.2d 1180, and in Judge Miller's majority opinion in *Minder v. Martin Luther Home Foundation* (1990), Ind. App., 558 N.E.2d 833. Additionally, each of those opinions lists numerous decisions by our sister states that conclude that group homes are residential uses that do not violate restrictive covenants similar to those in question here.

## II. *State Police Powers*

In analyzing whether Indiana was justified in exercising its police powers when enacting IND.CODE § 16–13–21–14, the majority opinion looks to the United States Supreme Court decision in *Allied Structural Steel Co. v. Spanaus* (1978), 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727. The Court in *Spanaus* considered whether the disruption with contractual expectations "was necessary to meet an important general societal problem" and whether it was enacted "to protect a broad societal interest rather than a narrow class." The majority opinion in our case examines the

same factors and concludes their inquiry in the negative. I disagree with this conclusion.

The majority opinion determines that the justification behind IND.CODE § 16–13–21–14 is insufficient in that it does not address a broad, generalized societal problem and it is not "resonably necessary for the protection of the health, safety, and welfare of the general public." I disagree with this determination.

In analyzing the relationship between a state's right to exercise its police powers in a manner that impairs private contracts, the U.S. Supreme Court has said:

> [I]t is to be accepted as a [sic] commonplace that the Contract Clause does not operate to obliterate the police power of the States. 'It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected. This power, which in its various ramifications is known as the police power, is an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals.'

*Keystone Coal Assn. v. DeBenedictis* (1987), 480 U.S. 470, 503, 107 S.Ct. 1232, 1251, 94 L.Ed.2d 472, 500, *quoting Home Building & Loan Assn. v. Blaisdell* (1934), 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413.

As the Court in Keystone explains, the first inquiry is whether the right to contract has been impaired. Certainly it has been in this case. The next inquiry must be into whether the public purpose asserted is "significant and legitimate." *Keystone,* 480 U.S. at 505, 107 S.Ct. at 1252, 94 L.Ed.2d at 501.

It is certainly true that statistically the mentally handicapped comprise less than a majority of the general public. In fact, in purely numeric terms, they may be considered insignificant. The care and treatment of this statistic minority, however, is of tremendous concern to society generally.

The care and treatment of the mentally and physically handicapped in our State represents a significant financial obligation. Consequently, each individual taxpayer, regardless of his personal contact with or need for such services, has at least an economic interest in how they are managed. Each taxpayer has a direct interest in ensuring that every patient within the State system receives the most cost efficient, beneficial care possible, thus allowing them to function at their highest possible level of independence and productivity. Mainstreaming is regarded as an effective, efficient treatment option. Thus, mainstreaming creates economic benefits to society as a whole.

The project of mainstreaming patients is designed not only to alleviate a substantial tax drain, but also to provide the social contact necessary to improve the patient's condition. By placing the patient in a situation closely replicating average day-to-day life, the patient will become a more productive citizen. It is certainly the goal of our State that each citizen should be encouraged to be as productive and independent as possible. Again, society as a whole is benefitted.

Finally, mainstreaming provides a benefit to the neighborhood. As with any policy of integration, mainstreaming places the mentally and physically handicapped into an environment not generally acquainted with their nature and the daily challenges they face. Placing handicapped and nonhandicapped persons side by side helps to break stereotypes, overcome prejudices, and create a more understanding society. Again, society as a whole is benefitted.

The argument that any legislative act aimed at benefiting society generally by first directly benefiting a minority of the population is improper sets a dangerous precedent. This rationale could be used to attack any social legislation aimed at protecting any racial, ethnic, physical, or religious minority. Our inquiry must be whether the legislative act was designed to

protect the health, safety and welfare of the general public. The fact that it accomplishes this goal by first directly impacting a minority group and then secondarily impacting society in general is irrelevant so long as it can be shown that the action taken does, in fact, address a matter of general societal concern. Certainly, ensuring that the mentally and physically impaired receive effective treatment designed to aid them both in independent living and general productivity as citizens and that such treatment is conducted in a manner aimed at alleviating the financial burden on the State is a matter of general societal concern. Thus, the public purpose asserted is both legitimate and significant.

Once satisfied of this point, the Court in *Keystone* directs us to our last test: "A court must also satisfy itself that the legislature's adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption." *Keystone* at 505, 107 S.Ct. at 1252, 94 L.Ed.2d at 501. (Citations omitted.) The Court then goes on to recite what I believe to be the crucial consideration on this point. "But, we have repeatedly held that unless the State is itself a contracting party, courts should properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Id.* (Citations omitted.)

I believe that *Ind.Code* § 16–13–21–14 was clearly a proper exercise of this State's police powers and thus not unconstitutional. The enactment represents a reasonable, rational approach to a significant problem impacting the general citizen population. Accordingly, the impairment of contractual obligations by the State was justified. The summary judgments entered against Christole and Hopewell should be reversed.

DeBRULER, J., concurs.