ATTORNEY FOR APPELLANT
Chad Michael Smith
Evansville, Indiana

ATTORNEYS FOR APPELLEE
Brent Stuckey
Jill Doggett
Katie Kotter
Vincennes, Indiana

ATTORNEYS FOR AMICUS CURIAE
STATE OF INDIANA
Gregory F. Zoeller
Attorney General of Indiana

Thomas M. Fisher
Solicitor General

Ashley Tatman Harwel
Heather Hagan McVeigh
Deputy Attorneys General
Indianapolis, Indiana

_____

## In the
## Indiana Supreme Court



FILED
May 14 2013, 11:36 am

CLERK
of the supreme court,
court of appeals and
tax court

_____

No. 42S00-1210-PL-597

GIRL SCOUTS OF SOUTHERN ILLINOIS,

*Appellant (Defendant below),*

v.

VINCENNES INDIANA GIRLS, INC.,

*Appellee (Plaintiff below).*

_____

Appeal from the Knox Circuit Court, No. 42C01-1005-PL-310
The Honorable Sherry B. Gregg Gilmore, Judge

_____

On Direct Appeal

_____

**May 14, 2013**

**Rush, Justice.**

The Contracts Clause of the Indiana Constitution protects vested contract rights, including agreed contractual restrictions on land use, against retroactive impairment. Here, one Scouting organization deeded its campground to another on the condition that the Scouting use continue for 49 years, with the deed providing that ownership of the campground would revert to the original owner (the grantor) if the Scouting-use condition was breached during that time. We con-

clude that the Contracts Clause of the Indiana Constitution protects the enforceability of this 49-year land use limitation despite a subsequently enacted statute, Indiana Code section 32-17-10-2, that purports to limit reversionary clauses in land transactions to a maximum of 30 years.

**Facts and Procedural History**

In 1946, Vincennes University donated Camp Wildwood to Vincennes Indiana Girls, Inc. ("VIG") — then known as Vincennes Indiana Girl Scout Council, Inc. — for use as a Girl Scout facility for the local troops. Then in 1965, the national Girl Scouts reorganized, and required VIG's local organization to be absorbed into a predecessor entity of Girl Scouts of Southern Illinois, Inc. ("GSSI"). That reorganization also required VIG to convey Camp Wildwood to GSSI's predecessor for continued use as a camping facility for Girl Scouts in GSSI's region.

VIG deeded Camp Wildwood as demanded, but on the condition that it be used for Scouting purposes for 49 years, enforced by a 49-year possibility of reverter to VIG, and a prohibition on "the grantor" (which, as the parties acknowledged, would be nonsensical unless it was a scrivener's error for "grantee") selling or conveying the Camp during that time. Substituting the current parties' proper names for clarity, the deed provided:

> [T]he conveyance of which real estate . . . shall be upon and subject to the condition that such real estate . . . shall revert to [VIG] if the same are not used for and as a Girl Scouts camping site and facilities for a period of forty-nine years from and after the date of such conveyance and transfer, which reversion shall automatically occur upon such failure of use as aforesaid; provided, however, that . . . for the period aforesaid no rights shall exist in [GSSI] to convey, sell or dispose of said real estate in any fashion whatsoever or its use destroyed or terminated during the aforesaid forty-nine year period except as hereinbefore permitted; . . . provided further[,] however[,] that if [VIG]'s existence is terminated or corporate charter surrendered, reversionary rights automatically terminate.

Both before and after the transfer, about 25 Vincennes-area Girl Scout troops used Camp Wildwood for their weekly meetings, summer day camps, singalongs and overnight camping, special events like "Boo Bash," "Daisy Tea," "Birthday Bash," "Brownie Fest," and "Egg Hunt." The camp also hosted other community events.

That use continued for 44 years — until January 2009, when GSSI ceased using Camp Wildwood as a Girl Scout facility and decided to sell. It notified VIG of its intent to sell the camp,

instructed VIG to remove its belongings within 30 days, and locked Vincennes-area troops out of the camp. VIG later discovered that it had been administratively dissolved in April 2004 for failure to pay annual fees to the Secretary of State, but was reinstated in August 2009.

In May 2010, VIG sued to quiet title to Camp Wildwood and enjoin GSSI from selling the camp until the 49-year period had expired, alleging that an Indiana statute limiting the duration of reversionary interests to 30 years was unconstitutional as applied, as a retroactive impairment of its contract rights. GSSI counterclaimed to quiet title, alleging that VIG's reversionary interest expired by operation of the statute in 1995, or by the terms of the deed when VIG was administratively dissolved in 2004.

The trial court granted summary judgment quieting title in VIG, and GSSI appealed. The appeal was initially filed in the Court of Appeals, but because the trial court's judgment declared a state statute unconstitutional, Appellate Rule 4(A)(1)(b) gives this Court mandatory and exclusive jurisdiction over the appeal. The case was therefore transferred to this Court under Appellate Rule 6, and proceeded as a direct appeal.

## Standard of Review

In reviewing summary judgment rulings, we apply the same standard as the trial court: "summary judgment is appropriate only where the evidence shows there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law." Tom-Wat, Inc. v. Fink, 741 N.E.2d 343, 346 (Ind. 2001). In reviewing cross-motions for summary judgment, we consider each motion separately to make that determination. Keaton & Keaton v. Keaton, 842 N.E.2d 816, 819 (Ind. 2006). But here, the parties disagree only as to the appropriate legal conclusions, without controverting the other's facts — and so both motions present pure questions of law. See Tom-Wat, 741 N.E.2d at 346 ("[B]oth Fink's and Tom-Wat's motions for summary judgment "present[] a question of law because . . . the affidavits filed by the parties do not raise any factual disputes. Rather, to the extent they conflict, they do so only as to legal conclusions.").

## Discussion

On appeal, GSSI argues that possibilities of reverter are not protected against retroactive impairment, because Indiana does not recognize them as vested rights — and thus, Indiana Code

section 32-17-10-2, which voids reversionary interests after 30 years, is constitutional. It also argues in the alternative that VIG's reversionary interest in Camp Wildwood terminated by the terms of the deed when VIG was administratively dissolved in 2004. VIG argues that its reverter is just one part of a larger vested right to enforce the deed's requirement that Camp Wildwood be used as a Scout camp for 49 years; and that under the relevant statute, its corporate existence continued through its administrative dissolution and was reinstated retroactively as if the dissolution never happened. We address the administrative dissolution issue first, because we generally avoid addressing constitutional questions if a case can be resolved on other grounds. Ind. Wholesale Wine & Liquor Co., Inc. v. State ex rel. Ind. Alc. Bev. Comm'n, 695 N.E.2d 99, 106 (Ind. 1998); Citizens Nat. Bank of Evansville v. Foster, 668 N.E.2d 1236, 1241 (Ind. 1996).

## I. VIG's Administrative Dissolution and Reinstatement.

GSSI's non-constitutional argument relies on the deed's provision that "if [VIG]'s existence is terminated or corporate charter surrendered, reversionary rights automatically terminate." GSSI argues that when VIG was administratively dissolved by the Indiana Secretary of State in 2004, its existence — and thus, its reverter — terminated as the deed contemplates; and that because GSSI closed Camp Wildwood in January 2009, VIG's August 2009 reinstatement came eight months too late to exercise the reverter. Based on the controlling statutes, we disagree.

First, Indiana Code section 23-17-23-2(c) provides in relevant part that an administratively dissolved non-profit corporation "*continues [its] corporate existence* but may not carry on any activities except those necessary to wind up and liquidate [its] affairs under IC 23-17-22-5" (emphasis added). We cannot conclude that VIG's existence was "terminated" in terms of the deed, when the controlling statute expressly provides that its existence "continue[d]." And though GSSI also argues that VIG "surrendered its charter," we find the ordinary sense of "surrender" connotes a *voluntary* act. See Black's Law Dictionary 1581 (9th ed. 2009) ("2. The giving up of a right or claim.") Here, GSSI has designated nothing to controvert VIG's evidence that the failure to pay fees that caused its dissolution was *involuntary*, following the death of its corporate secretary who had handled those matters in the past.

Second, Indiana Code section 23-17-23-3(c) expressly provides that "the reinstatement relates back to and takes effect as of the effective date of the administrative dissolution and the

corporation resumes carrying on the corporation's activities *as if the administrative dissolution had never occurred*." (Emphasis added.) We are bound to enforce that statute by its terms. GSSI urges us to "hold [VIG] accountable for its mistakes" by creating an exception that "rights and assets of which the corporation was divested prior to the revival" cannot be reinstated. Appellant's Br. at 22, citing Arnold Developer, Inc. v. Collins, 567 A.2d 949, 952 (Md. 1990). But Arnold reached that conclusion because the controlling Maryland statute expressly provides that "[a]ll the assets and rights of the corporation [are restored], *except those sold or those of which it was otherwise divested while the charter was void*." 567 A.2d at 952, quoting Md. Code Ann., Corps. & Ass'ns § 3-512(2) (LexisNexis 1989) (emphasis added). Our Code has no comparable provision, and we will not invent one.

In sum, VIG's corporate existence continued (albeit in a limited capacity) even while it was administratively dissolved, and its reinstatement was retroactive "as if the . . . dissolution had never occurred." Accordingly, the dissolution did not terminate VIG's existence or surrender its charter, and so its reversionary rights did not terminate by operation of the deed. Since the parties' non-constitutional arguments cannot resolve this case, we turn to the constitutional question.

## II. Constitutionality of Indiana Code Section 32-17-10-2 as Applied.

### A. Contracts Clause and Rights Under a Deed.

Under the Contracts Clause of our state Constitution, "[n]o *ex post facto* law, or law impairing the obligation of contracts, shall ever be passed." Ind. Const. art. 1, § 24. We have held that provision protects vested contract rights, Pulos v. James, 261 Ind. 279, 289–90, 302 N.E.2d 768, 775 (1973) — including contract rights arising under a deed, Clem v. Christole, Inc., 582 N.E.2d 780, 782 (Ind. 1991). The question presented here, as we restate it, is whether Indiana Code section 32-17-10-2 unconstitutionally impairs VIG's contract rights under the deed to enforce the condition subsequent.

The statute at issue declares possibilities of reverter invalid after 30 years, even if the interest was created before the statute was enacted:

> A possibility of reverter or right of entry for breach of a condition subsequent concerning real property is invalid after thirty (30) years from the date the

5

possibility of reverter or right of entry is created, notwithstanding a period of creation longer than thirty (30) years:

(1) if the breach of the condition has not occurred; and

(2) despite whether the possibility of reverter or right of entry was created before, on, or after July 1, 1993.

Ind. Code § 32-17-10-2 (2004). Like any statute under constitutional challenge, it comes before us with a strong presumption of constitutionality, and every doubt must be resolved in favor of its validity. Steup v. Ind. Hous. Fin. Auth., 273 Ind. 72, 75, 402 N.E.2d 1215, 1217 (1980).

Even under that steep standard, we have invalidated a statute that retroactively impaired homeowners' rights under restrictive covenants as violating Article 1, Section 24. In Clem, home-owners challenged the constitutionality of a statute voiding restrictive covenants to the extent they barred special-needs group homes from residential subdivisions. 582 N.E.2d at 781. We recognized that the covenants gave the homeowners a protected contract right that could not be retroactively impaired, id. at 782, except in a legitimate exercise of the "*necessary* police power," id. at 783–84 (emphasis original). Finally, we held that even though "mainstreaming" the developmentally disabled was a worthy goal that could justify prohibiting such covenants in the future under the "general" police power, it could not impair existing covenants under the narrower "necessary" police power. Id. at 784. We therefore declared the statute unconstitutional under Article 1, Section 24. Id. at 785.

But GSSI and the Attorney General as *amicus* argue that Indiana Code section 32-17-10-2 is different, asserting that the Contracts Clause protects only vested rights, while possibilities of reverter have traditionally been considered too remote to be treated as vested. We have never squarely held that unvested rights are *not* protected — only that vested rights *are*. E.g., Pulos, 261 Ind. at 289–90, 302 N.E.2d at 775 ("[T]he Legislature may prohibit contracts that are against public policy," but "nevertheless[] may not impair previously legal contracts after the rights there-under have vested."); see also S. Bend Cmty. Sch. Corp. v. Nat'l Educ. Ass'n–S. Bend, 444 N.E.2d 348 (Ind. Ct. App. 1983). And Indiana has at least implicitly followed the traditional common law rule that a "naked possibility of reverter" is too remote and speculative to be treated as vested. E.g., Outland v. Bowen, 115 Ind. 150, 154, 17 N.E. 281, 283 (1888); accord, Gushwa v. Gushwa, 93 Ind. App. 68, 73–74, 177 N.E. 366, 368 (1931) ("Until the breach of [a] condition [subsequent]

6

and a reverting of the estate through re-entry[,] the whole title is in the grantee," so that any potential reversion, "being a mere possibility, is not an estate.") (internal quotation omitted). Yet even if both points are correct, they miss the larger picture. We see VIG's reverter as secondary to the parties' bargained-for limit on GSSI's use of the land — essentially the same interest at issue in Clem, and subject to the same constitutional protections.

**B. Nature of VIG's Contract Right.**

Though VIG retained a possibility of reverter in its conveyance to GSSI, the deed reveals that it retained other rights as well — and we are concerned with VIG's entire "bundle of rights," rather than any one of them individually. Deeds, like contracts, are read as a whole, and we determine the parties' intent by the unambiguous language they used, presuming they intended each part to have meaning. Tazian v. Cline, 686 N.E.2d 95, 97 (Ind. 1997). Applying that standard here shows that the parties' central focus was to impose a contract obligation on GSSI to use Camp Wildwood "for and as a Girl Scouts camping site and facilities for a period of forty-nine years." The remaining provisions are subsidiary, framed in terms of *enforcing* that obligation:

- VIG's "reversion shall automatically occur *upon such failure of use*" as a Girl Scout camp, and

- GSSI is deprived of any right "to convey, sell or dispose of [the Camp] . . . *or its use destroyed or terminated* during the aforesaid forty-nine year period."

(Emphases added.)

Reading those provisions together makes clear that VIG's reversionary interest works in tandem with the charitable-use requirement to create a valid condition subsequent. Such conditions are generally disfavored and strictly construed, so that "nothing short of express provisions for forfeiture and either a reverter . . . or a right to retake the property in the donor or his heirs [will] enable a donor to effectively impose a condition subsequent." St. Mary's Med. Ctr. v. McCarthy, 829 N.E.2d 1068, 1075–76 (Ind. Ct. App. 2005), reh'g denied (internal citations and quotations omitted). And VIG's deed does just that: it requires GSSI to use the camp for Scouting purposes for 49 years, expressly provides for forfeiture in case of nonuse, and creates a possibility of reverter to enforce that condition. The condition would therefore be enforceable, regardless of its duration. (For example, because of a charitable bequest John Herron made subject to a condition subsequent,

the Herron School of Art and Design at Indiana University–Purdue University (Indianapolis) has borne his name since 1895. See id. at 1076 & n.3, citing Herron v. Stanton, 79 Ind. App. 683, 147 N.E. 305 (1920).)

Moreover, VIG reinforced that condition subsequent with an additional mechanism that is *only* permissible in charitable conveyances — depriving GSSI of the right "to convey, sell or dispose of said real estate in any fashion whatsoever" during the required 49-year period of Scouting use. Just as conditions subsequent are generally disfavored, so are restrictions on alienation, because "[t]he power to dispose of real estate is universally regarded as an inseparable incident of a fee." Granger v. Granger, 147 Ind. 95, 111, 46 N.E. 80, 83 (1897). Nevertheless, we permit such restrictions in charitable conveyances in order to encourage philanthropy. See Quinn v. Peoples Trust & Sav. Co., 223 Ind. 317, 60 N.E.2d 281 (1945) ("the rule against restraints upon alienation does not apply to public charitable trusts"); Hays v. Harmon, 809 N.E.2d 460, 467 (Ind. Ct. App. 2004) ("A charitable trust is a favorite of the law, and the most liberal rules of construction will be employed to sustain and uphold every attempt of a person to donate his property to a charitable use."), trans. denied. And by withholding that ordinarily "inseparable" ownership *power* from GSSI as grantee, VIG necessarily retained a corresponding *right* as grantor — a right we have characterized as "vested":

> The foundation of the power to restrain alienation rests upon the fact that there remains or *is vested* in someone a valid remainder or reversion, whose estate in possession is contingent upon some event which defeats the precedent estate, and who is entitled to take advantage of the prohibited act or use.

Conger v. Lowe, 164 Ind. 368, 371, 24 N.E. 889, 889–90 (1890) (emphasis added).

Accordingly, even though the enforcement mechanism in this case is different than in Clem, the thrust of the parties' bargain is the same — a land-use restriction. In both cases, the restriction "impos[es] an affirmative burden" and "touches and concerns the land" — and thus is of a type that would be capable of running with the land, even indefinitely, when the parties so intend. See Columbia Club, Inc. v. American Fletcher Realty Corp., 720 N.E.2d 411, 418 (Ind. Ct. App. 1999), trans. denied ("[A] real covenant imposing an affirmative burden will run with the land if: (1) the covenantor and covenantee intend it to run; (2) the covenant touches and concerns the land; and (3) there is privity of estate between subsequent grantees of the original covenantor and covenantee."). Here, though the parties only intended the restriction to run for 49 years instead

of indefinitely, their contract would nevertheless be substantially impaired if it were cut off after just 30 years by applying Indiana Code section 32-17-10-2 — an effect just as "permanent, irrevocable, and retroactive in altering the [parties'] contractual relationships" as in Clem. 582 N.E.2d at 784. We see no reason this restriction, and the contractual relationship it creates, should have any less constitutional protection in a condition subsequent than in a restrictive covenant as in Clem.

### C. "Necessary" Police Power.

Even though the deed's land-use restriction is a protected contract right, it may nevertheless be restricted under certain circumstances. The Legislature's "general" police power gives it broad authority to limit prospectively what parties may contract for, but it may retroactively impair existing contracts only through the "necessary" police power, which is much narrower. "Legislation [that] invade[s] freedom of contract can only be sustained . . . if it both relates to the claimed objective and employs means which are both reasonable and reasonably appropriate to secure such objective." Clem, 582 N.E.2d at 783 (internal quotations and citations omitted). Here, we agree with the Attorney General that the Legislature's likely objective in enacting Indiana Code section 32-17-10-2 was to promote marketable title by terminating clouds on title that had outlived their usefulness and limiting them to a period in which they are likely to retain their utility. A statutory 30-year cap on such interests may well meet the "reasonable and reasonably appropriate" standard as applied to what Outland called "naked possibilities of reverter" — those that depend on speculation or chance, particularly about matters that do not touch and concern the land. See Outland, 115 Ind. at 152–53, 17 N.E. at 282 (contingent on grantee dying childless); Gushwa, 93 Ind. App. at 70, 177 N.E. at 367–68 (contingent on grantee predeceasing the grantor).

But as discussed above, VIG's reversionary interest is secondary to its principal interest in Camp Wildwood — the restricted use it imposed on the conveyance to GSSI.[1] Again, because that restriction imposes on GSSI a contract obligation that touches and concerns the land, it is

---

[1] Since we resolve this issue by analogy to restrictive covenants, we need not consider VIG's alternative argument that we should join an arguable modern trend toward treating possibilities of reverter as becoming "'vested' in the grantor from [their] creation." Washington State Grange v. Brandt, 136 Wash. App. 138, 150, 148 P.3d 1069, 1075 (2006), review denied. See also, e.g., Bagby v. Bredthauer, 627 S.W.2d 190, 196–97 (Tex. App. 1981) (so holding as to possibility of reverter in oil royalties); Restatement (Third) of Prop.: Wills & Other Donative Transfers § 25.1 cmt. a (2011) ("a future interest arises when it is created, not in the future when or if the right to possession or enjoyment matures").

closely akin to the restrictive covenants in <u>Clem</u>. Such restrictions have significant social utility. In a residential context, they can "permit property owners to collectively provide or obtain protections significantly contributing to the peace, safety, and well-being of themselves and their families." <u>Clem</u>, 582 N.E.2d at 784. In the commercial context, they can promote the economic viability of a development and protect the investments made by landlords and tenants alike. <u>Tippecanoe Assocs. II, LLC v. Kimco Lafayette 671, Inc.</u>, 829 N.E.2d 512, 514 (Ind. 2005) (collecting cases upholding non-competition covenants in shopping center leases). And in this charitable context, the restriction not only maintained the camp's continued public and community use, which is a good in itself, but appears to have been the primary consideration for an otherwise-gratuitous conveyance. When a reverter or condition subsequent serves a function equivalent to a restrictive covenant, arbitrarily terminating it after 30 years is neither "reasonable" nor "reasonably appropriate," <u>Clem</u>, 582 N.E.2d at 783, and therefore is not within the necessary police power. In that context, Indiana Code section 32-17-10-2 is unconstitutional as applied.

**Conclusion**

A corporation continues a limited corporate existence even while it is administratively dissolved, and reinstatement restores its full status as if the dissolution never happened. VIG's administrative dissolution, and subsequent reinstatement, therefore did not trigger the deed's provision extinguishing VIG's reversionary interest if its "existence is terminated or corporate charter surrendered."

And because VIG's interest imposes a land-use restriction similar to a restrictive covenant, it deserves the same level of Contracts Clause protection. Since the parties bargained for a 49-year land use limitation on Camp Wildwood, terminating that restriction after just 30 years would substantially impair VIG's contract rights. Indiana Code section 32-17-10-2 is therefore unconstitutional as applied retroactively to the land-use restriction in VIG's deed to GSSI. Accordingly, we affirm the trial court.

Dickson, C.J., and Rucker, David, and Massa, JJ., concur.

10